John Buse (CA Bar No. 163156)
Harrison Beck (CA Bar No. 341717)
Jared Margolis (OR Bar No. 146145, Pro Hac Vice Pending)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375, Oakland, CA 94612
Tel: (510) 844-7100
Fax: (510) 844-7150
jbuse@biologicaldiversity.org
hbeck@biologicaldiversity.org
jmargolis@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity
and Friends of the River*

Eric J. Buescher (CA Bar No. 271323)
Christie D. Ralston (CA Bar No. 362848)
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, CA 94612
Phone: (510) 735-9700
eric@baykeeper.org
christie@baykeeper.org

*Attorneys for Plaintiff San Francisco Baykeeper*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE RIVER, | Case No. |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *v.* | |
| U.S. BUREAU OF RECLAMATION, NATIONAL MARINE FISHERIES SERVICE, DOUG BURGUM, in his official capacity as the Secretary of the Interior, HOWARD LUTNICK, in his official capacity as the Secretary of Commerce, and SCOTT CAMERON, in his official capacity as the Acting Commissioner of the U.S. Bureau of Reclamation, | |
| *Defendants*. | |

1

**INTRODUCTION**

1.    In this civil action for declaratory and injunctive relief, Plaintiffs San Francisco Baykeeper ("Baykeeper"), Center for Biological Diversity ("Center"), and Friends of the River (collectively, "Plaintiffs") challenge the failure of Defendants the U.S. Bureau of Reclamation ("Reclamation"), Doug Burgum, in his official capacity as the Secretary of the Interior, Scott Cameron, in his official capacity as the Acting Commissioner of Reclamation, the National Marine Fisheries Service ("NMFS"), and Howard Lutnick, in his official capacity as the Secretary of Commerce (collectively, "Defendants") to comply with their mandatory duties under the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), regarding the impacts to federally-protected species from Reclamation's operation of the Central Valley Project ("CVP"), one of the largest water infrastructure and conveyance systems in the United States.

2.    The CVP includes dams, reservoirs, water diversion facilities, conveyance channels, pumping facilities, and other water infrastructure that operate to capture the flow of fresh water from upstream rivers, including the Sacramento and San Joaquin Rivers, into the Sacramento-San Joaquin Delta ("Delta") and the San Francisco Bay (together with the Delta, the "Bay-Delta"), and to export vast quantities of that water from the Delta southward.

3.    The Bay-Delta "is a critically important natural resource for California and the nation ... [and] serves Californians concurrently as both the hub of the California water system and the most valuable estuary and wetland ecosystem on the west coast of North and South America." Cal. Water Code § 85002. The Bay-Delta and the Sacramento and San Joaquin Rivers and their tributaries (together the "Bay-Delta Watershed") comprise "an important habitat for thousands of river and anadromous fish, many of which are endangered[,]" including, but not limited to, winter-run Chinook Salmon (*Oncorhynchus tshawytscha*), California Central Valley

2
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Steelhead (*Oncorhynchus mykiss irideus*), and North American Green Sturgeon (*Acipenser medirostris*). *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 981, 986 (9th Cir. 2014).



Fig. 1: Map of Sacramento-San Joaquin River Delta (Courtesy of U.S. Geological Survey)

4.    In operating the CVP, Reclamation controls a significant portion of the volume of water flowing through the Sacramento and San Joaquin Rivers by prescribing releases from upstream reservoirs, which operate as water storage facilities. *Id.* at 984. Reclamation also influences flow levels through its export of large volumes of water from the Bay-Delta Watershed south to the California Aqueduct and/or the Delta-Mendota Canal. *See id.* As a result, Reclamation's operation of the CVP has significant, population-level impacts on protected species throughout the Bay-Delta Watershed and on the ecological viability and vitality of the Bay-Delta Watershed in general.

3

5.     CVP operations alter the timing and volume of flows in ways that significantly impact winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon—all species protected by the Endangered Species Act. CVP operations also impact water temperature, salinity, and other water quality characteristics throughout the Bay-Delta Watershed, often to the detriment of those and other species. CVP exports and diversions radically alter the volume and direction of water flowing through the Delta. These changes cause members of these species to become disoriented and swim into inhospitable environments where they are subject to elevated levels of predation, harm, and mortality. CVP export and diversion facilities also entrain (i.e., trap) significant numbers of individual fish.

6.     Section 7 of the ESA requires that federal agencies such as Reclamation consult with NMFS to ensure that their actions do not jeopardize the continued existence of ESA-listed species or impair their critical habitat, 16 U.S.C. § 1536(a)(2). Accordingly, in 2024, NMFS issued the latest in a series of biological opinions (the "2024 BiOp") intended to ensure that Reclamation's operations of the CVP, along with the California Department of Water Resources' ("DWR") coordinated operations of the State Water Project ("SWP"),[1] do not jeopardize listed species in the Bay-Delta Watershed or adversely modify their critical habitat. The 2024 BiOp imposes restrictions on Reclamation's operations and mandates that the agency undertake specific actions to limit its impacts in order to prevent the operation of the CVP from jeopardizing the continued existence of protected species.

---

[1] Reclamation and DWR operate the CVP and SWP pursuant to a Coordinated Operations Agreement. The SWP is a State-operated constellation of water conveyance and diversion infrastructure in the Bay-Delta Watershed similar to the CVP.

4

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

7.    Reclamation has failed to comply with the 2024 BiOp and has exceeded the incidental take limits set forth in the incidental take statement of the 2024 BiOp[2] for California Central Valley Steelhead and North American Green Sturgeon. For example, the 2024 BiOp establishes incidental take limits for California Central Valley Steelhead of "5,294 juveniles in any single year or 2,319 juveniles as a 3-year rolling average[.]" Publicly available monitoring data from the California Department of Fish and Wildlife ("CDFW") shows that, beginning on March 16, 2025, Reclamation exceeded the three-year rolling average incidental take limit for California Central Valley Steelhead of 2,319 fish, and by April 9, 2025, CVP export facilities had caused the three-year rolling average to exceed 2,400 fish. Likewise, the 2024 BiOp establishes incidental take limits for North American Green Sturgeon "salvaged" (i.e., rescued or relocated) at CVP export and diversion facilities of 14 individuals in a single year or five on a three-year rolling average. Yet, Reclamation has admitted to salvaging 20 North American Green Sturgeon in Water Year 2025[3] alone, thereby exceeding both the annual and three-year-rolling-average incidental take limits for North American Green Sturgeon established in the 2024 BiOp. Moreover, take of North American Green Sturgeon has continued in Water Year 2026; Reclamation reported salvage of six North American Green Sturgeon on November 18, 2025, less than two months after Water Year 2026 began on October 1.

---

[2] The ESA prohibits the "take" of protected species unless specifically authorized. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined broadly to include actions that "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect [protected species], or attempt to engage in any such conduct." *Id*. § 1532(19). Through the issuance of an "Incidental Take Statement," federal regulators can authorize specified amounts of take where that take is incidental to an otherwise lawful federal action; agency recipients of Incidental Take Statements must conform to the incidental take limits provided therein and cannot cause their actions to take covered species in excess of those limits. *Id*. § 1536(b)(4); *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 990 (D. Or. 2010).

[3] In California, a Water Year begins on October 1 and continues to the following September 30. Thus, Water Year 2025 was from October 1, 2024 through September 30, 2025.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

8.      Reclamation has also failed to comply with mandatory actions intended to limit the impacts of its management of the CVP on winter-run Chinook Salmon populations. Specifically, in March 2025, Reclamation failed to curtail its exports, as required by the 2024 BiOp, after exceeding two separate loss thresholds for hatchery-produced winter-run Chinook Salmon.

9.      Accordingly, Plaintiffs seek declaratory relief finding Reclamation in violation of Sections 7 and 9 of the ESA for failing to comply with mandatory measures and incidental take limits in the 2024 BiOp and thereby taking (i.e., harming, trapping, and/or killing) protected species without valid incidental take coverage and jeopardizing the continued existence of California Central Valley Steelhead and North American Green Sturgeon, as well as injunctive relief compelling Reclamation to strictly comply with the terms and conditions of the 2024 BiOp in order to meet its ESA duties. In addition, Plaintiffs seek declaratory and injunctive relief compelling Reclamation and NMFS to reinitiate ESA Section 7 consultation in order to produce a new biological opinion to ensure that Reclamation's future operations of the CVP do not jeopardize the continued existence of listed species in the Bay-Delta Watershed.

## JURISDICTION AND VENUE

10.     This court has jurisdiction over this action pursuant to 16 U.S.C. section 1540(c) (actions under the ESA); 16 U.S.C. section 1540(g) (ESA citizen suit provision); 5 U.S.C. section 702 (Administrative Procedure Act); 28 U.S.C. section 1331 (federal question); 28 U.S.C. section 1346 (action against the United States); 28 U.S.C. section 1361 (action to compel an officer of the United States to perform his or her duty); and 28 U.S.C. section 2201-02 (power to issue declaratory judgments in cases of actual controversy).

6

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

11.     Venue is proper in this district pursuant to 16 U.S.C. section 1540(g)(3)(A) because the violations of the ESA complained of herein occurred, will occur, and/or are occurring in this district, pursuant to 28 U.S.C. section 1391(e)(1)(C) because Plaintiff Friends of the River resides in the district, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

**PARTIES**

12.     Plaintiff BAYKEEPER, d/b/a San Francisco Baykeeper, is a non-profit public benefit corporation organized under the laws of the State of California with its main office at 1736 Franklin Street, Suite 800, Oakland, California 94612. Baykeeper's approximately 3,500 members live and/or recreate in and around the San Francisco Bay area and the Bay-Delta Watershed in general. Baykeeper's mission is to defend San Francisco Bay from its biggest threats and hold polluters and government agencies accountable to create healthier communities and help wildlife thrive. Its team of scientists and lawyers investigates pollution via aerial and on-the-water patrols, strengthens regulations through science and policy advocacy, and enforces environmental laws on behalf of itself, its members, and the public. To further its mission, Baykeeper actively seeks federal and state agency implementation of the Endangered Species Act, the California Endangered Species Act, the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members pursuant to those statutes.

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national nonprofit conservation organization with approximately 101,000 members dedicated to the protection of biodiversity and ecosystems throughout the world, including California. The Center works through science, law, and creative media to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters, and climate that

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

species need to survive. The Center has offices in California and approximately 19,042 members across the state. The Center actively advocates for the protection of imperiled species and habitats, including for the protection of the lands and biological resources within the Bay-Delta Watershed at issue herein. Center members have regularly visited and will continue to visit the Bay-Delta Watershed, the Bay-Delta itself, and both the Sacramento and San Joaquin Rivers to recreate and to view, photograph, study, and enjoy its incredible, irreplaceable biodiversity, including winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon.

14.    Plaintiff FRIENDS OF THE RIVER is a non-profit organization dedicated to preserving and restoring California's rivers, streams, and their watersheds as well as advocating for sustainable water management. Friends of the River accomplishes this goal by influencing public policy and inspiring citizen action through grassroots organizing. Friends of the River was founded in 1973 during the struggle to save the Stanislaus River from the New Melones Dam. Following that campaign, the group grew to become a statewide river conservation organization. Friends of the River currently has nearly 3,000 members. Members of Friends of the River enjoy the scenic beauty of the Bay-Delta, the Sacramento River and its tributaries and sloughs upstream from the Bay-Delta, and the Bay-Delta Watershed in general and raft, kayak, boat, fish, and swim in these waters.

15.    Plaintiffs and their members have been, are being, and will continue to be adversely affected and irreparably injured by Defendants' violations of the ESA and by Reclamation's operation of the CVP in the Bay-Delta Watershed insofar as Reclamation's operation of the CVP harms winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon and their habitat. Reclamation's operation of the CVP

8

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

harms Plaintiffs' and their members' ability to observe, study, photograph, and enjoy the Bay-Delta Watershed and these species and thus causes them to suffer actual injury in fact that is concrete and particularized, including harm to their aesthetic, recreational, scientific, and conservation interests.

16. For example, members of Plaintiffs live near to and visit the Bay-Delta Watershed and regularly to seek out winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon, among other species, and plan to continue to do so. Plaintiffs' members not only visit the Bay-Delta Watershed to view and observe these species for recreational purposes (including rafting, fishing, and wildlife photography) but also do so to study these species and for other scientific purposes as well. Indeed, Plaintiffs have members who are leading scientists studying these species in the Delta. Plaintiffs' members regularly take boating trips in the Bay-Delta and the rivers that feed into it to view, photograph, and study California Central Valley Steelhead, Chinook Salmon, and North American Green Sturgeon. Plaintiffs' members likewise have plans to return to and visit areas within the Bay-Delta Watershed for recreational and scientific purposes, including to view, photograph, and study California Central Valley Steelhead, Chinook Salmon, and North American Green Sturgeon.

17. Moreover, Plaintiffs and their members have been instrumental in helping to prevent Bay-Delta species from going extinct. The Center and its members, for example, drafted and submitted the petition that led to the listing of North American Green Sturgeon under the ESA. After the species' listing in 2006, the Center and its members then undertook an advocacy campaign that led to the designation of the species' critical habitat in 2009 and the issuance of a recovery plan for the species in 2018. When those protections were challenged in court, the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Center intervened to help defend its victory and ensure that the protections it had fought for would remain in effect.

18.    The Center and its members also drafted and submitted analogous listing petitions under the California Endangered Species Act for other Bay-Delta species impacted by Reclamation's operations of the CVP, including but not limited to Longfin Smelt (*Spirinchus thaleichthys*) and Delta Smelt (*Hypomesus transpacificus*).

19.    Baykeeper and its members likewise have a long record of engaging in efforts to protect native fish species in the Bay-Delta Watershed and to educate the public about the threats to such species. For example, in 1992, Baykeeper and its members drafted and submitted a petition to list the San Francisco Bay-Delta distinct population of Longfin Smelt under the federal Endangered Species Act. Baykeeper also filed litigation against the federal government to compel the U.S. Fish and Wildlife Service to act on the 2007 federal listing petition.

20.    Baykeeper and its members also documented and alerted the public, as well as management agencies, of elevated mortality to winter-run Chinook Salmon adults that were exposed to high river temperatures in May 2022 that was caused by Reclamation's release of warm water from the Shasta and Keswick Dams.

21.    Baykeeper members also provided important technical testimony regarding the Bay-Delta Watershed and the fish species that rely on it, including winter-run Chinook Salmon, North American Green Sturgeon, and California Central Valley Steelhead, as part of litigation defending the 2009 biological opinion for the CVP and challenging the 2004 and 2019 biological opinions for the CVP. Notably, Baykeeper was also a plaintiff in the litigation challenging the 2004 biological opinion.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

22.    Plaintiffs and their members have also invested considerable time and resources trying to stop water development projects in the Bay-Delta Watershed, including the Delta Conveyance Project (and its predecessors, the California WaterFix Project and Bay Delta Conservation Plan), the Sites Reservoir, and the Peripheral Canal, that would harm native fish species, such as North American Green Sturgeon, Central Valley Steelhead, and winter-run Chinook Salmon. Plaintiffs and their members have similarly invested considerable time and resources to fight inadequate regulations in hopes of supporting North American Green Sturgeon and other species in the Bay-Delta Watershed.

23.    Plaintiffs' members' interests in viewing, observing, conserving, and studying these species have been, are being, and will continue to be impaired by Defendants' failure to comply with the terms of the 2024 BiOp and the incidental take statement provided therein. Reclamation's failure to comply with the 2024 BiOp results in harm to these species and their habitats, and thereby diminishes Plaintiffs' members' ability to view, observe, conserve, and study these species.

24.    Defendants' failure to reinitiate consultation on the 2024 BiOp further impairs Plaintiffs' members' interests in viewing, observing, conserving, and studying winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon because it allows the current biological opinion, which Reclamation is either unwilling or unable to comply with, to remain in effect and thereby jeopardizes the continued existence (and overall recovery) of these species.

25.    The above-described aesthetic, recreational, scientific, educational, conservation, and other interests have been, are being, and will continue to be adversely affected and

11
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

irreparably injured by Defendant's continued refusal to comply with its obligations under the ESA. The relief sought in this case will redress these injuries.

26.    Defendant UNITED STATES BUREAU OF RECLAMATION is the federal agency within the U.S. Department of the Interior that manages and operates the CVP and therefore has the primary oversight and enforcement responsibility to ensure that the requirements of the ESA and other applicable laws are followed with respect to the operation of the CVP.

27.    Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the U.S. Department of Commerce. NMFS is the agency to which the Secretary of Commerce has delegated the authority to implement the ESA with respect to threatened and endangered marine species, including California Central Valley Steelhead, North American Green Sturgeon, and winter-run Chinook Salmon. NMFS is the agency that prepared and issued the 2024 BiOp.

28.    Defendant DOUG BURGUM is sued in his official capacity as Secretary of the U.S. Department of the Interior.

29.    Defendant SCOTT CAMERON is sued in his official capacity as Acting Commissioner for the U.S. Bureau of Reclamation.

30.    Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce.

31.    Reclamation, NMFS, Secretary Burgum, Secretary Lutnick, and Acting Commissioner Cameron are "persons" within the meaning of the ESA's citizen suit provision, *see* 16 U.S.C. §§ 1532(13), 1540(g)(1)(A), and subject to the ESA's requirements and prohibitions.

## LEGAL BACKROUND

A.  The Endangered Species Act

32.    In enacting the ESA, Congress intended endangered species to be afforded the highest of priorities. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species. . . ." 16 U.S.C. § 1531(b).

33.    Under the ESA, conservation means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id*. § 1532(3).

34.    Federal agencies must "utilize their authorities in furtherance of the purposes of" the ESA and "carry[] out programs for the conservation of endangered species and threatened species. . . ." *Id*. § 1536(a)(1).

35.    The ESA assigns responsibility to implement the statute to the Secretaries of Commerce and Interior, which in turn have delegated responsibility to NMFS and the U.S. Fish and Wildlife Service ("FWS"), respectively. 50 C.F.R. § 402.01(b).

36.    Section 4 of the ESA requires FWS and NMFS to list species as "endangered" or "threatened" when they meet the statutory listing criteria. 16 U.S.C. § 1533. An "endangered" species is "in danger of extinction throughout all or a significant portion of its range," and a "threatened" species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(6), (20).

37.    Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' survival, but also its ultimate recovery. In particular, Section 9 of the ESA prohibits any person from "tak[ing]" any endangered species without

13
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

lawful authorization to do so. *Id*. § 1538(a)(1)(B). Persons subject to the prohibition on "take" include individuals and corporations, as well as "any officer, employee, agent, department, or instrumentality of the Federal Government ... [or] any State." *Id*. § 1532(13). The term "take" is defined broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id*. § 1532(19). "Take" is defined in the "broadest possible manner to include every conceivable way in which a person" could harm or kill wildlife. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995). Section 9's take prohibition applies to threatened species unless they are specifically exempted.

38.    Federal agencies may obtain lawful authorization for the incidental take of listed species from otherwise lawful activities through compliance with Section 7 of the Act, which sets forth a consultation process between the action agency and the expert wildlife agency (i.e., NMFS or FWS depending on the affected species). Section 7(a)(2) of the ESA requires agencies to "insure" that their actions are "not likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of [critical habitat] of such species. . . ." 16 U.S.C. § 1536(a)(2). To "jeopardize the continued existence of" a given species means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of [that] listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

39.    An agency's Section 7 duties are only fulfilled by its satisfaction of the consultation requirements that are set forth in the implementing regulations for Section 7 of the ESA, *id*. §§ 402.10-402.16, and only after the agency lawfully complies with these requirements may an action that "may affect" a protected species go forward.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40.     Agency "action" is defined broadly in the ESA's implementing regulations to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," such as the promulgation of regulations, the granting of permits, or actions directly or indirectly causing modifications to the land, water, or air. *Id*. § 402.02.

41.     For agency actions that "may affect" listed species, federal agencies (like Reclamation) must first produce a "biological assessment" to determine whether listed species are "likely to be [adversely] affected." 16 U.S.C. § 1536(c)(1). If the agency determines that an action "may affect" and "is likely to adversely affect" a listed species or its designated critical habitat, then the agency must enter into formal consultation with FWS or NMFS to determine whether their actions would jeopardize such species or adversely modify its critical habitat. 50 C.F.R. § 402.14.

42.     During formal consultation, NMFS or FWS (depending on the species) must evaluate the "effects of the action" and compare those effects to the existing environmental conditions—that is, the "environmental baseline." 50 C.F.R. § 402.02. "The environmental baseline includes the past and present impacts of all Federal, state, or private actions and other human activities in the action area. . . ." *Id.* The effects of the action must be considered together with "cumulative effects," which "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id*.

43.     Formal ESA consultation concludes with the issuance of a "biological opinion." 50 C.F.R. § 402.14(g)(4). The biological opinion states the federal wildlife agency's opinion as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. § 402.14(g)(4).

15
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The determination of whether an activity is likely to jeopardize the continued existence of a species must be based solely on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and NMFS (or FWS, depending on the species) must use the best available science in formulating its biological opinion. 50 C.F.R. § 402.14(g)(8).

44.    In other words, Section 7 of the ESA imposes both a procedural and a substantive mandate. "Agencies' obligations ... are not fulfilled merely by engaging in this procedural consultation process. Rather, the ESA also imposes substantive requirements pursuant to the 'no-jeopardy' provision. Under [Section] 7, the agency has an ongoing duty to avoid jeopardy that continues *regardless of the status of consultation*, so long as the agency retains discretionary control over the action." *Ctr. for Biological Diversity v. Ross*, 349 F. Supp. 3d 38, 42 (D.D.C. Oct. 4, 2018) (emphasis added) (citing *Cottonwood Envtl. Law Ctr. v. U.S. Forest Service*, 789 F.3d, 1075, 1087-88 (9th Cir. 2015)); *see also Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1094 (E.D. Wash. 2006) ("Section 7(a)(2) of the ESA imposes a substantive duty in addition to its procedural consultation requirement.").

45.    If the federal wildlife agency determines that the action is not likely to jeopardize a species, it may issue an incidental take statement ("ITS"). 16 U.S.C. § 1536(b)(4). An ITS must specify the allowed amount or extent of take (which would otherwise be prohibited under Section 9 of the ESA), "reasonable and prudent measures" ("RPMs") necessary or appropriate to minimize such take, and the "terms and conditions" that must be complied with by the action agency to implement any RPMs. *Id.*; 50 C.F.R. § 402.14(i).

46.    When all of the terms and conditions of the ITS and biological opinion are adhered to, the ITS provides "safe harbor" for the action agency, authorizing the specified, limited take of listed species that would otherwise violate Section 9's prohibition. *Dow*

16

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 261-62 (4th Cir. 2011) (citing 16 U.S.C. § 1536(o)(2)); *see also Or. Nat. Desert Ass'n*, 716 F. Supp. 2d at 990. However, violations of the terms and conditions of a biological opinion and ITS expose agencies to take liability because a violation of an ITS' terms "abrogates the safe harbor provision of the ITS. . . ." *Or. Nat. Desert Ass'n*, 716 F. Supp. 2d at 995.

47.    Similarly, where agencies do not implement actions contemplated in and required by the biological opinion, they violate the ESA, even where such actions have not otherwise resulted in exceedances of the incidental take limits provided in the ITS. *Ctr. for Biological Diversity v. United States BLM*, 698 F.3d 1101, 1108-1115 (9th Cir. 2012). Thus, if an agency does "not comply with all of the terms of the Biological Opinion, they would not be protected by the Biological Opinion's safe harbor" and would be subject to take liability. *Dow AgroSciences*, 637 F.3d at 260.

48.    After the issuance of a biological opinion and ITS and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency and the federal wildlife agency must reinitiate formal consultation: "(1) [i]f the amount or extent of taking specified in the incidental take statement is exceeded; (2) [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) [i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(a)(1)-(4).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

49. Section 7(d) of the ESA provides that once a federal agency initiates or reinitiates consultation under the ESA, the agency cannot "make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation. Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to listed species or adverse modification of critical habitat.

50. When a federal agency is compelled to reinitiate consultation pursuant to Section 7(a)(2), injunctive relief mandating that the agency strictly comply with the existing biological opinion is appropriate in order to avoid further harm to protected species. *See, e.g., Pac. Coast Fedn. of Fishermen's Ass'ns v. United States Bureau of Reclamation*, 2006 U.S. Dist. LEXIS 24893, at *3-6 (N.D. Cal. Mar. 27, 2006) ("Because the Ninth Circuit invalidated Phases I and II of the Klamath Irrigation Project Biological Opinion, pending reinitiation of ESA consultation and compliance with a new biological opinion, the law is clear that injunctive relief to protect the listed species should issue."); *see also Ctr. for Biological Diversity*, 349 F. Supp. 3d at 45-46.

B. The Administrative Procedure Act

51. The Administrative Procedure Act ("APA") governs the procedural requirements for agency decision-making and provides the standard of review for a federal agency's compliance with the ESA.

52. Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706.

53.     An agency action is arbitrary and capricious under the APA when the agency (1) has relied on factors which Congress has not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

A.  The Central Valley Project

54.     The CVP is a massive water storage and delivery project operated by Reclamation. The CVP is operated alongside and with the State Water Project pursuant to a Coordinated Operations Agreement between Reclamation and DWR.

55.     CVP export operations use pumping facilities in the Delta, such as the C.W. Bill Jones Pumping Plant, to deliver water south, primarily for agricultural operations in California's Central Valley.

56.     In December 2024, Reclamation issued a Record of Decision ("2024 ROD") for CVP operations that incorporated the 2024 BiOp and described operations of the CVP that would be bound by California Water Rights Decision D-1641[4] and the Coordinated Operations Agreement with DWR.

---

[4] Decision D-1641 is an order by the California State Water Resources Control Board that imposes limitations on Reclamation's operation of the CVP to protect water quality and support

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fig. 2: Map of Central Valley Project (Courtesy of U.S. Bureau of Reclamation)

57.    CVP operations are required to comply with the California State Water Resources Control Board's Order D-1641, which sets forth specific conditions for Reclamation's use of water from the CVP. Compliance with Water Rights Order D-1641 is an assumed condition precedent to CVP operations under the 2024 BiOp.

58.    CVP export operations influence the hydrology, hydrodynamics, and water quality of the Bay-Delta Watershed by removing large volumes of water and altering the timing

aquatic life. Compliance with Water Rights Order D-1641 is an assumed condition precedent to CVP operations under the 2024 BiOp.

20

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

of water that would flow into, through, and out of the Bay-Delta Watershed if not diverted. Changes in the Bay-Delta Watershed from CVP export operations include, but are not limited to, reduction in flow volumes, alteration of the natural timing of river flows, and increased salinity levels. CVP export operations also impact the magnitude and directionality of currents, such as in the Old and Middle Rivers—the main channels in the south Delta. The Old and Middle Rivers are naturally subject to tidal influences. When Reclamation increases CVP exports, flow in the Old and Middle Rivers becomes increasingly negative (or reversed from its natural course) such that the average flow is away from San Francisco Bay and towards the water export infrastructure.

59.     These changes in the Bay-Delta Watershed have significant negative impacts on native fish species, including those listed as "threatened" or "endangered" under the Endangered Species Act, such as winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon.

B.   The Impacts of the CVP on ESA-Listed Species

60.     The Sacramento River winter-run Chinook Salmon[5] is an anadromous fish species listed as "endangered" under the ESA. 59 Fed. Reg. 440, 441 (Jan. 4, 1994). Winter-run Chinook Salmon are hatched in the fresh waters of the Sacramento River system, emigrate through the Bay-Delta to the Pacific Ocean as juveniles, and return to the fresh waters of the upper Sacramento River as adults to spawn. To complete this life cycle, adult and juvenile salmon must

---

[5] There are several different distinct population segments of Chinook Salmon within the Bay-Delta Watershed, depending on when that cohort of salmon migrates upstream to breed. The term "winter-run Chinook Salmon" refers to a distinct population segment of Chinook Salmon that migrates upstream through the Bay-Delta Watershed during the winter months. Further, winter-run Chinook Salmon are produced in two ways –naturally or via the Livingston Stone National Fish Hatchery, located adjacent to the Shasta Dam upstream of the Sacramento River. Different management standards apply to hatchery-origin fish and to natural-origin fish.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

migrate through the Bay-Delta. Downstream emigration of juveniles toward the Pacific Ocean through the Bay-Delta typically occurs from November to early April, while adult upstream migration toward the upper Sacramento River through the Bay-Delta typically occurs from December through July.

61.    Since winter-run Chinook Salmon egg incubation occurs during the warmest time of the year, adult spawners require stream reaches with plentiful cold, clean water to protect embryos and juveniles from the warm ambient summer conditions. Coldwater flows are essential to winter-run Chinook Salmon egg and embryo survival, as mortality increases rapidly as water temperatures increase above 53.5º Fahrenheit. Juvenile and adult life stages are also highly sensitive to water temperatures above stage-specific thresholds. Reclamation's management of cold water river flows into and through the Sacramento River and broader Delta ecosystem is therefore an important factor for the viability of the winter-run Chinook Salmon population and the species' ability to recover.

62.    The Shasta Dam, which is part of the CVP, blocks winter-run Chinook Salmon from their historical spawning and rearing habitats in the upper Sacramento River and its tributaries. Winter-run Chinook Salmon previously spawned upstream of the Shasta Dam but are now forced to spawn downstream of the Keswick Dam on the Sacramento River. All of the species' coldwater habitat that is essential for breeding and rearing is located upstream of the dams. Reclamation's management of the Shasta Dam to store and release sufficient volumes of cold water to allow successful spawning, incubation, rearing, and migration of juveniles is essential to the continued existence of the single remaining winter-run Chinook Salmon population, which spawns below the dam. In 1992, Congress authorized and funded Reclamation to design and install a temperature control device on Shasta Dam, which increased access to cold

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

water stored in Shasta Reservoir and flexibility in managing the coldwater pool. The temperature control device began operations in 1997.

63.    The survival during migration of juvenile winter-run Chinook Salmon is strongly and positively correlated with river flows into and through the Delta. These flows are impacted by Reclamation's storage of Central Valley runoff behind Shasta Dam, water diversions by CVP contactors upstream of the Delta, and by the export of water from the Delta.

64.    In addition, CVP water exports from the Delta entrain migrating juvenile winter-run Chinook Salmon into areas of the Delta where survival is low, including into the water export infrastructure where direct mortality (i.e., "loss") is estimated as a function of fish identified and counted at the fish "salvage" facilities of the CVP and SWP.

65.    On August 4, 1989, NMFS listed winter-run Chinook salmon as "threatened" under the ESA. 54 Fed. Reg. 32,085, 32,086 (Aug. 4, 1989). On January 4, 1994, NMFS uplisted the species' status to "endangered." 59 Fed. Reg. at 440.

66.    California Central Valley Steelhead[6] are also anadromous salmonid fish that are born in the fresh waters of the Sacramento and San Joaquin Rivers and their tributaries, emigrate through the Bay-Delta Watershed to the Pacific Ocean, where they spend much of their adult life, and migrate back to their natal streams to breed. For California Central Valley Steelhead, downstream emigration through the Bay-Delta toward the Pacific Ocean typically occurs from fall to early summer, while upstream migration through the Bay-Delta toward freshwater streams occurs typically from late August through March. Unlike Chinook Salmon, juvenile California

---

[6] The term "California Central Valley Steelhead" refers to the California Central Valley distinct population segment of steelhead, described as inhabiting the Sacramento and San Joaquin Rivers and their tributaries. This population segment is genetically and evolutionarily distinct from Steelhead elsewhere in the world and is uniquely adapted to the Bay-Delta Watershed ecosystem.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Central Valley Steelhead rear in freshwater for a year or more; adults survive after spawning and may migrate back to the ocean between attempts to reproduce.

67. As with winter-run Chinook Salmon, CVP dams block California Central Valley Steelhead from accessing large amounts of their historic spawning and rearing habitat. CVP operations limit the coldwater habitat necessary for successful California Central Valley Steelhead rearing and migration.

68. Survival of migrating juvenile California Central Valley Steelhead is strongly and positively correlated with river flow volume into the Delta. CVP water storage operations often lower river flows upstream and into the Delta.

69. In addition, water export operations in the Delta cause entrainment and disorientation for migrating juvenile California Central Valley Steelhead, resulting in elevated levels of mortality, which is estimated by regulatory agencies as a function of enumerated "salvage" at facilities in the CVP and SWP water export infrastructure.

70. The California Central Valley Steelhead distinct population segment has been listed by NMFS as "threatened" under the ESA since March 19, 1998. 71 Fed. Reg. 834, 834 (Jan. 5, 2006).

71. The North American Green Sturgeon,[7] like Chinook Salmon and California Central Valley Steelhead, is an anadromous fish species. North American Green Sturgeon are born in the upper mainstem of the Sacramento River, the Feather River, and the Yuba River, emigrate as juveniles to the Pacific Ocean, and return to fresh water to breed. They become

---

[7] For the purposes of this Complaint, the term "North American Green Sturgeon" refers to the southern distinct population segment of the North American Green Sturgeon species, which spawns and breeds in the upper mainstem of the Sacramento River, the Feather River, and the Yuba River.

24

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

sexually mature at approximately 15 years of age and typically return to spawn every three to four years thereafter. The species spawns in cool, deep, swift-flowing river reaches over gravel and cobble bottoms. After remaining in fresh water for several months to a year after spawning, adults return to the ocean. North American Green Sturgeon spend much of their life in marine waters, more so than most other sturgeon species; adults and sub-adults spend many months each year in ocean waters along the coasts of California, Oregon, and Washington. These fish live up to 60 years.

72.    Juvenile North American Green Sturgeon emigrate through the Bay-Delta after rearing for approximately 6-24 months upstream. Like winter-run Chinook Salmon and California Central Valley Steelhead, North American Green Sturgeon are negatively affected by reduced instream flows and altered timing of those flows caused by CVP reservoir operations, and entrainment and reduced Delta outflows caused by CVP water export operations in the Delta. North American Green Sturgeon are also harmed by CVP dams that block access to their historic spawning grounds.

73.    NMFS listed the southern distinct population segment of North American Green Sturgeon as "threatened" under the ESA on April 7, 2006. 71 Fed. Reg. 17,757, 17,758 (Apr. 7, 2006).

C.    Violations of the 2024 BiOp

74.    As a result of the CVP's significant effects on these and other ESA-listed species, NMFS, via the 2024 BiOp, imposes limitations on Reclamation's operation of the CVP and requires the agency to undertake specified, carefully-considered actions to help minimize its impacts on listed species and ensure that its operation of the CVP does not jeopardize the continued existence of such species.

25

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

75.     The 2024 BiOp includes an ITS that imposes take limits for ESA-protected species. As relevant here, the 2024 BiOp's ITS provides that Reclamation exceeds the incidental take limits for California Central Valley Steelhead if its operation of the CVP results in the loss of 5,294 unclipped (i.e., wild, not hatchery raised) juvenile California Central Valley Steelhead in a single year or the loss of 2,319 unclipped juvenile California Central Valley Steelhead as a three-year rolling average.

76.     Likewise, the 2024 BiOp's ITS provides that Reclamation exceeds the incidental take limits for North American Green Sturgeon if 14 individuals are "salvaged" from CVP export and diversion facilities in a single year or if five fish are "salvaged" annually as a three-year rolling average. Fish are "salvaged" when they are enumerated in the "salvage facilities" that are part of the CVP and SWP diversion infrastructure. "Salvaged" fish that survive the screening and handling process are released elsewhere in the Delta.

77.     Reclamation has exceeded the aforementioned incidental take limits for California Central Valley Steelhead and North American Green Sturgeon. Publicly-available monitoring data from CDFW demonstrate that Reclamation's operations of the CVP caused the three-year rolling average loss of unclipped juvenile California Central Valley Steelhead to exceed 2,319 fish. These data show that by April 9, 2025, the three-year rolling average loss for California Central Valley Steelhead had risen to more than 2,400 fish, exceeding the relevant take limit from the 2024 BiOp.

78.     Likewise, Reclamation's own monitoring shows that Reclamation "salvaged" 20 North American Green Sturgeon during Water Year 2025, far in excess of the 14-individual annual take limit and the five-individual three-year rolling average take limit prescribed by the 2024 BiOp's ITS.

26

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

79. CVP operations continue to result in the salvage of North American Green Sturgeon. According to Reclamation's own monitoring reports, at least six North American Green Sturgeon have already been salvaged in Water Year 2026.

80. The 2024 BiOp also imposes mandatory actions that Reclamation must take to limit the impact of its operations of the CVP on winter-run Chinook Salmon. For instance, the 2024 BiOp mandates that Reclamation take specific actions when its operation of the CVP results in the cumulative loss of hatchery-origin winter-run Chinook Salmon in excess of the "annual loss threshold" for that species. The "annual loss threshold" for hatchery-origin winter-run Chinook Salmon is 0.12 percent of the juvenile production estimate ("JPE"), which is an annual calculated estimate of the number of juvenile winter-run Chinook Salmon smolt migrating downriver to the Bay-Delta, on their way to the Pacific Ocean.

81. Pursuant to the 2024 BiOp, when Reclamation exceeds 50 percent of the "annual loss threshold" for winter-run Chinook Salmon, it must coordinate with DWR to "adjust south Delta exports to maintain a 7-day average of the [Old and Middle River Index] no more negative than -3,500 [cubic feet per second ("cfs")] for 7 consecutive days. . . ." The 2024 BiOp further requires that when Reclamation exceeds 75 percent of the "annual loss threshold" for winter-run Chinook Salmon, it must run the Winter-Run Chinook Salmon Machine Learning Model ("Machine Learning Model"), and if the model estimates that a change in flow in the Old and Middle River channels of the San Joaquin River to no more negative than -2,500 cfs would result in no further winter-run Chinook Salmon becoming entrained in CVP water export infrastructure, it must "restrict South Delta exports to maintain a 7-day average [] value no more negative than the -2,500 cfs for 7 consecutive days." When Reclamation exceeds 100 percent of the "annual loss threshold" for winter-run Chinook Salmon, it is required to convene the Salmon

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Monitoring Team and an independent peer review panel to review CVP operations and loss thresholds and provide guidance to minimize subsequent loss.

82.     Reclamation failed to comply with the mandatory actions the 2024 BiOp requires when it exceeded 50, 75, and 100 percent of the "annual loss threshold" for hatchery-origin winter-run Chinook Salmon. According to Reclamation's own monitoring reports, the agency exceeded 50 percent of the 2024 BiOp's "annual loss threshold" for winter-run Chinook Salmon on March 18, 2025. Reclamation's publicly-available monitoring reports likewise show that it exceeded 75 percent of the 2024 BiOp's "annual loss threshold" for winter-run Chinook Salmon on March 19, 2025, and that the agency exceeded 100 percent of the "annual loss threshold" for winter-run Chinook Salmon on March 22, 2025.

83.     Reclamation's own, publicly-available monitoring data show that after the agency exceeded the 50 percent "annual loss threshold" for hatchery-original winter-run Chinook Salmon, the agency failed to reduce exports in the manner required by the 2024 BiOp. Reclamation's own monitoring data also show that after exceedance of 75 percent of the "annual loss threshold" and predictions by the Machine Learning Model that a seven-day average Old and Middle River Index value of no more negative than -2,500 cfs would lead to an absence of winter-run Chinook Salmon from salvage, Reclamation failed to reduce exports to achieve a seven-day average Old and Middle River Index value of no more negative than -2,500 cfs, as the 2024 BiOp requires.

84.     Reclamation also failed to comply with the conditions and requirements of D-1641 during its operations of the CVP in the spring of 2025. This is important because NMFS presumed that Reclamation would comply with the order when preparing the 2024 BiOp and evaluating and mitigating the impacts of Reclamation's operation of the CVP on listed species.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Between April 1, 2025, and April 18, 2025, Reclamation operated the CVP such that average actual flows at Vernalis, a key monitoring site on the San Joaquin River, fell below the required monthly flow objective of 2,280 cfs required pursuant to D-1641 for that time period. Similarly, between May 20, 2025, and May 31, 2025, CVP operations failed to meet the required monthly flow objective at Vernalis. Flows at Vernalis are very strongly and positively correlated with survival of California Central Valley Steelhead emigrating from the San Joaquin River and its tributaries, so Reclamation's failure to maintain water quality and quantity there is particularly detrimental for emigrating California Central Valley Steelhead. According to NMFS, the San Joaquin River population of California Central Valley Steelhead is key to maintaining the diversity of this distinct population segment.

D. Notice of ESA Violations

85.    By written notice sent by electronic mail and certified mail on November 14, 2025, Plaintiffs informed Defendants of the violations described in this Complaint more than 60 days prior to the filing of the Complaint, as required by the Endangered Species Act. 16 U.S.C. § 1540(g).

86.    Plaintiffs' November 14 notice letter provided detailed information indicating that Reclamation failed to implement the 2024 BiOp's terms and conditions—including by failing to comply with mandatory response actions triggered when Reclamation exceeded the "annual loss thresholds" for winter-run Chinook Salmon and also by exceeding the three-year rolling average incidental take limit for California Central Valley Steelhead and North American Green Sturgeon and the annual incidental take limit for North American Green Sturgeon—and therefore abrogated its Section 9 incidental take coverage and failed to ensure against jeopardy, as ESA Section 7 requires. The letter also informed Reclamation that such violations require reinitiation

29

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

of Section 7 consultation, among other requirements. The November 14 notice letter also informed Reclamation that each instance where its operation of the CVP killed, harmed, or trapped California Central Valley Steelhead and North American Green Sturgeon in excess of the incidental take limits provided in the incidental take statement of the 2024 BiOp violates Section 9's prohibition on the unauthorized take of listed species. Reclamation has failed to remedy the violations alleged in the November 14 notice letter, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. section 2201(a).

87.    In addition, by written notice sent by electronic mail and certified mail on December 16, 2025, Plaintiffs informed Defendants that Reclamation also exceeded the three-year rolling average incidental take limit for North American Green Sturgeon in Water Year 2025 alone. More than 60 days have passed since Plaintiffs sent the December 16 supplemental notice letter. 16 U.S.C. § 1540(g).

88.    Reclamation has likewise failed to remedy the violation alleged in the December 16 supplemental notice letter, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. section 2201(a).

E.   Reclamation's Recent Plan to Increase Water Exports

89.    In response to the Trump Administration's Executive Order 14181, "Emergency Measures To Provide Water Resources in California and Improve Disaster Response in Certain Areas," 90 Fed. Reg. 8747 (Jan. 31, 2025), Reclamation recently announced that it will be operating the CVP pursuant to a new operational plan that it has referred to as "Action 5" and that is distinct from the operational regime considered in the 2024 BiOp and 2024 ROD.

90.    Implementation of Action 5 would reduce protections for ESA-listed fish species covered by the 2024 BiOp. For example, Action 5 eliminates operations contained in the 2024

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

BiOp and 2024 ROD in a manner that would substantially increase the annual loss of winter-run Chinook Salmon relative to those detailed in the 2024 BiOp. Action 5 would also reduce or remove Old and Middle River flow limitations in ways that would lead to more negative reverse flows, which would be expected to increase entrainment of fish into the interior Delta and thereby increase direct and indirect mortality of listed fish species.

91.    Furthermore, in the words of the State Water Resources Control Board, "Action 5 assumes the use and approval of [temporary urgency change petitions, which waive water quality requirements imposed by the State Water Resources Control Board] on a consistent and prolonged basis[.]" In other words, operations under Action 5 would consistently be out of compliance with the Water Board's water quality requirements, which are also part of Reclamation's permits to operate the CVP and are explicitly incorporated into the operations described in the 2024 BiOp and 2024 ROD. Action 5 would increase CVP water exports above the quantities approved in the 2024 BiOp and 2024 ROD.

92.    Action 5 would also increase the "annual loss thresholds" for juvenile winter-run Chinook Salmon from 0.12 percent of the JPE for hatchery winter-run and 0.5 percent of the JPE for natural origin winter-run to 1 percent of the JPE for both hatchery and natural origin winter-run Chinook Salmon. Action 5 would further remove requirements for Old and Middle River management present in the 2024 BiOp, such as export reductions triggered when the agency exceeds 50 and 75 percent of the "annual loss threshold" for winter-run Chinook Salmon.

93.    By Reclamation's own analysis Action 5 is predicted to increase losses for winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon. In its review of Action 5, the State Water Resources Control Board observed that "there is a pattern of the CVP exceeding take limits for listed species and either taking no action or pursuing

31

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

increased take limits without sufficient analysis as to whether such continued actions are reasonably expected, directly or indirectly, to diminish a species' numbers, reproduction, or distribution so that the likelihood of both survival and recovery is appreciably reduced."

94.    CDFW expressed concern that the proposed Action 5 operations could increase loss of winter-run Chinook Salmon by as much as an order of magnitude.

95.    Under Reclamation's operation of the CVP pursuant to the newly-implemented Action 5, Reclamation will continue to export water at levels that will result in the future loss of winter-run Chinook Salmon, California Central Valley Steelhead, and North American Green Sturgeon in violation of the 2024 BiOp.

96.    Reclamation did not initiate consultation with NMFS prior to adopting Action 5. Upon information and belief, Reclamation does not plan to engage in consultation with NMFS related to Action 5.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Endangered Species Act Section 7(a)(2), 16 U.S.C. § 1536(a)(2)**
**(Failure to ensure that operation of the CVP is not likely to jeopardize listed species or adversely modify critical habitat)**

97.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

98.    Reclamation has an ongoing duty pursuant to ESA Section 7(a)(2) to "insure" that its operation of the CVP is not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species' critical habitat. 16 U.S.C. § 1536(a)(2).

99.    Reclamation's operation of the CVP poses the risk of jeopardy for listed species, including by changing the timing, duration, and volume of cold water flows through the Bay-

Delta Watershed, increasing water temperatures in certain areas of the Bay-Delta Watershed, exacerbating water quality issues in the Bay-Delta Watershed, and entraining individual fish into water export facilities. Thus, there is no doubt that Reclamation's operation of the CVP directly harms listed species, threatens to degrade critical habitat, and thus jeopardizes their continued existence.

100.  The 2024 BiOp provides specific measures and limitations on the operation of the CVP that NMFS has determined are necessary to avoid jeopardizing the continued existence of listed species. Reclamation, however, has failed to comply with the 2024 BiOp and has violated the take limits set forth in the 2024 BiOp's ITS.

101.  For example, the 2024 BiOp establishes incidental take limits for unclipped (i.e., wild, not hatchery raised) California Central Valley Steelhead of "5,294 juveniles in any single year or 2,319 juveniles as a 3- year rolling average . . . ." Yet, publicly available monitoring data from CDFW show that beginning on March 16, 2025, Reclamation exceeded the three-year rolling average incidental take limit for California Central Valley Steelhead of 2,319 fish, and by April 9, 2025, CVP export facilities caused the three-year rolling average to exceed 2,400 fish.

102.  Likewise, the 2024 BiOp establishes incidental take limits for North American Green Sturgeon salvaged at CVP export and diversion facilities of "14 green sturgeon in a single year, or 5 on a 3-year rolling average." Reclamation's own reporting shows that it salvaged 20 North American Green Sturgeon in Water Year 2025 alone, thereby exceeding both the annual and three-year rolling average incidental take limits for North American Green Sturgeon established in the 2024 BiOp. And it has further admitted to salvaging six additional North American Green Sturgeon already in Water Year 2026, thereby exacerbating its exceedance of the three-year rolling average incidental take limit for North American Green Sturgeon.

103.    By exceeding incidental take limits provided in the ITS, Reclamation has failed to ensure that its operation of the CVP will not jeopardize the continued existence of affected listed species, including California Central Valley Steelhead and North American Green Sturgeon, in violation of Section 7 of the ESA. 16 U.S.C. § 1536(a)(2); *see also Ctr. for Biological Diversity*, 349 F. Supp. 3d at 42 ("Under [Section] 7, the agency has an ongoing duty to avoid jeopardy that continues regardless of the status of consultation, so long as the agency retains discretionary control over the action."); *Defs. of Wildlife*, 454 F. Supp. 2d at 1094 ("Section 7(a)(2) of the ESA imposes a substantive duty in addition to its procedural consultation requirement.").

104.    Reclamation's exceedances of the take limits in the ITS for the 2024 BiOp are ongoing and/or likely to recur. Reclamation's exceedance of the three-year rolling average incidental take limit for North American Green Sturgeon remains ongoing, and the agency is on track to exceed the annual incidental take limit for North American Green Sturgeon again this water year, as Reclamation has already admitted to salvaging at least six North American Green Sturgeon in Water Year 2026. Reclamation is also likely to exceed the three-year rolling average take limit for Central Valley Steelhead again during spring or early-summer of this year.

105.    Reclamation's recent announcement and its upcoming implementation of Action 5 increases the likelihood that the agency will exceed the take limits in the 2024 BiOp's ITS in 2026. Action 5 signals Reclamation's intention to export water out of the Bay-Delta to the maximum extent possible, even though such exports have resulted in ESA violations in the past and are likely to do so in the future. Reclamation's analysis of the impacts of Action 5 acknowledges that, as a result of the Action 5 CVP operational regime, predicted losses of California Central Valley Steelhead and North American Green Sturgeon will increase and the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

annual amount of such species salvaged at CVP export facilities will also increase. It is therefore likely that the violations alleged herein will continue and/or recur in Water Year 2026.

106.   Declaratory relief that Reclamation has exceeded the take limits set forth in the 2024 BiOp and is therefore jeopardizing listed species in violation of the ESA and an injunction are therefore warranted to compel Reclamation to strictly comply with the 2024 BiOp and ITS in order to ensure that Reclamation's activities do not continue to jeopardize listed species in violation of the ESA. 16 U.S.C. § 1536(a)(2).

<b>SECOND CLAIM FOR RELIEF</b>

<b>Violation of 50 C.F.R. § 402.16, Endangered Species Act, 16 U.S.C. §§ 1531 <i>et seq.</i>, and the Administrative Procedure Act, 5 U.S.C. § 706(1)</b><br><b>(Failure to reinitiate consultation on Reclamation's Operation of the CVP)</b>

107.   Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

108.   Reclamation and NMFS are required to reinitiate ESA Section 7 consultation on the 2024 BiOp because "the amount or extent of taking specified in the incidental take statement [has been] exceeded." 50 C.F.R. § 402.16. As set forth above, Reclamation has exceeded the three-year rolling average incidental take limit in the 2024 BiOp for California Central Valley Steelhead, the three-year rolling average incidental take limit in the 2024 BiOp for North American Green Sturgeon, and the annual incidental take limit (of 14 individual fish salvaged in a single year) for North American Green Sturgeon. And Reclamation has continued to exceed the 3-year rolling average take limit for Green Sturgeon in Water Year 2026 and is on track to exceed the annual incidental take limit for North American Green Sturgeon this Water Year as well.

35
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

109.    Likewise, Reclamation and NMFS are required to reinitiate ESA Section 7 consultation on the 2024 BiOp because "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," and because the action was "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." *Id*.

110.    Reclamation has failed to comply with mandatory response actions set forth in the 2024 BiOp that were triggered when it exceeded 50 and 75, and 100 percent of the "annual loss threshold" for hatchery-origin winter-run Chinook Salmon.

111.    Reclamation has also repeatedly failed to comply with California Water Rights Decision D-1641, even though NMFS expressly considered compliance with that regulation to be a mandatory background condition of the agency's operation of the CVP when preparing the 2024 BiOp.

112.    Reclamation's inability or unwillingness to comply with the operational parameters triggered when it exceeded 50 and 75 percent of the "annual loss threshold" for hatchery-origin winter-run Chinook Salmon and its inability or unwillingness to conform to the requirements of California Water Rights Decision D-1641 constitute new information and/or a modification of the action that was not considered in the 2024 BiOp and require Reclamation and NMFS to reinitiate ESA Section 7 consultation on the 2024 BiOp. *Id*.

113.    Reclamation's inability or unwillingness to comply with the operational parameters that NMFS relied on for its analysis regarding whether Reclamation's operation of the CVP would jeopardize the continued existence of the species constitutes new information regarding impacts to listed species not previously considered, requiring reinitiation of ESA Section 7 consultation for the operation of the CVP. *Id*.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

114.    Defendants' failure to reinitiate consultation violates the ESA and its implementing regulations, *id*., and constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1).

**THIRD CLAIM FOR RELIEF**

**Violation of the Endangered Species Act Section 9, 16 U.S.C. § 1538
(Unlawful Take of Listed Species)**

115.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

116.    The ESA prohibits the "taking" of any endangered species without lawful authorization to do so. 16 U.S.C. § 1538(a)(1)(B). One means by which a federal agency like Reclamation may obtain lawful authorization to take listed species is via a biological opinion and ITS issued pursuant to Section 7 of the Act. *Id*. § 1536(b)(4). When all of the terms and conditions of the ITS and biological opinion are adhered to, the ITS provides "safe harbor" for the action agency, authorizing the specified, limited take of listed species that would otherwise violate Section 9's prohibition. *Dow AgroSciences LLC*, 637 F.3d at 261-262. However, when an agency violates the mandatory terms of a biological opinion or exceeds the incidental take limits imposed by its ITS, it "abrogates the safe harbor provision of the ITS" and is exposed to Section 9 take liability. *Or. Nat. Desert Ass'n*, 716 F. Supp. 2d at 995.

117.    As discussed, Reclamation has violated the three-year rolling average incidental take limit for California Central Valley Steelhead, both the annual and three-year rolling average incidental take limits for North American Green Sturgeon, and has failed to implement nondiscretionary protective measures when it exceeded 50 and 75 percent of the "annual loss threshold" for hatchery-origin winter-run Chinook Salmon.

37

118.   Reclamation has therefore abrogated the incidental take coverage of the 2024 BiOp and ITS, making the agency liable under Section 9 of the ESA for take of endangered fish species. 16 U.S.C. § 1536(o); *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (an agency disregards a biological opinion "at its own peril"); *Or. Natural Desert Ass'n*, 716 F. Supp. 2d at 995 (exceedance of incidental take limits "abrogates the safe harbor provision of the ITS"); *Ctr. for Biological Diversity*, 698 F.3d at 1108-1115; *Dow AgroSciences*, 637 F.3d at 260 (where an agency does "not comply with all of the terms of the Biological Opinion, they would not be protected by the Biological Opinion's safe harbor" and would be subject to take liability). Any take that occurred and/or occurs above and beyond the take limits set forth in the ITS or following Reclamation's failure to comply with non-discretionary protective measures is therefore subject to Section 9 liability.

119.   The Court should find that Reclamation is in violation of Section 9 of the ESA and enjoin the agency from any further violations.

## **PRAYER FOR RELIEF**

For the reasons stated above, Plaintiffs respectfully request that the Court grant the following relief:

1.   Declare that Reclamation has violated ESA Section 7(a)(2) and its implementing regulations by failing to comply with the provisions of the 2024 BiOp and ITS;

2.   Declare that Reclamation and NMFS are in violation of Section 7(a)(2) of the ESA for failing to reinitiate consultation on the CVP;

3.   Declare that Reclamation has violated ESA Section 9 and enjoin the agency from further unpermitted take of listed species;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

4.      Order, through an injunction, that Reclamation operate the CVP in strict compliance with the terms and conditions of the 2024 BiOp until it completes the reinitiation process and obtains a new, updated biological opinion;

5.      Award Plaintiffs costs and attorneys' fees under the ESA, 16 U.S.C. § 1540(g); and

6.      Grant Plaintiffs such other and further relief as the Court deems just and equitable.

DATED: March 2, 2025

Harrison Beck (SBN 341717)
John Buse (SBN 163156)
Jared Margolis (Pro Hac Vice Pending)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, California 94612
T: (510) 731-6639 ext. 446
T: (510) 844-7150
hbeck@biologicaldiversity.org
jbuse@biologicaldiversity.org
jmargolis@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Friends of the River*

Eric Buescher (SBN 271323)
Christie Ralston (SBN 362848)
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, California 94612
T: (510) 671-5402
T: (510) 671-7088
eric@baykeeper.org
christie@baykeeper.org

*Attorneys for Plaintiff San Francisco Baykeeper*

39

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF