**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, et al., | Case No. 2:26-cv-0671 JLT EPG |
| Plaintiffs, | ORDER DENYING WITHOUT PREJUDICE REQUEST FOR TEMPORARY RESTRAINING ORDER |
| v. | |
| U.S. BUREAU OF RECLAMATION, et al., | (Doc. 47) |
| Defendants. | |

## I.    INTRODUCTION

Plaintiffs, a pair of environmental organizations interested in the health of California's San Francisco Bay, the Sacramento-San Joaquin Delta, and the species that reside in or transit through the Bay-Delta watershed, bring this lawsuit against the U.S. Bureau of Reclamation (Reclamation) and the National Marine Fisheries Service (NMFS), as well as various official representatives of those agencies. (Doc. 46.) Reclamation operates the federal Central Valley Project (CVP), "one of the largest water infrastructure and conveyance systems in the United States." (*Id*., ¶ 1.)

On June 24, 2026, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction concerning Reclamation's planned operations for Shasta Dam and Reservoir for the remainder of this summer and early fall. (Doc. 47.) In very general terms,

1

Plaintiffs contend that Reclamation's planned operations do not comport with the requirements of a 2024 Endangered Species Act biological opinion ("2024 BiOp") applicable to the joint operation of the CVP (of which Shasta Dam is one component) and California's State Water Project (SWP) (Collectively, the "Projects"). (*See generally* Doc. 47-1 at 21 (describing Reclamation's conduct as an "open violation").) Plaintiffs request two forms of immediate relief in the form of a TRO that: (1) requires Reclamation to reduce releases from Shasta and (2) directs the U.S. Bureau of Reclamation to prepare an alternative plan for operation of Shasta through the summer and early fall of this water year.

As explained in greater detail below, though Plaintiffs advance a colorable reading the 2024 BiOp's requirements, Reclamation's own reading is not obviously unreasonable. Because no party presents arguments related to or articulates standards governing how the Court should resolve a dispute about *interpretation* of the terms of the BiOp under remotely analogous circumstances, the Court concludes that it cannot *on this record* find that Plaintiffs are likely to succeed or that they have a "fair chance" at success on the merits sufficient to trigger the "serious questions" injunctive relief standard. Thus, the TRO request is **DENIED WITHOUT PREJUDICE**.

## II.   LEGAL FRAMEWORK

### A.   The Endangered Species Act

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (citing 16 U.S.C. § 1533). FWS and NMFS administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). Most pertinent to this case are Section 7, 16 U.S.C. § 1536, and Section 9, 16 U.S.C. § 1538, of the ESA. Section 7(a)(2) imposes a procedural duty on the federal agencies to consult with the U.S. Fish and Wildlife Service (FWS) or NMFS, depending on the protected species,[1] to "insure that any action

---

[1] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1120 n. 1 (E.D. Cal. 2008), *as corrected* (Oct. 31,

authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16 U.S.C. § 1536(a)(2). An agency "action" is defined to mean all activities carried out by federal agencies, including, among other things, the granting of licenses and permits. *See* 50 C.F.R. § 402.02. "If a contemplated agency action may affect a listed species, then the agency must consult with the Secretary of the Interior, either formally or informally." *Am. Rivers v. NMFS*, 126 F.3d 1118, 1122 (9th Cir. 1997).

Formal consultation results in the issuance of a BiOp by the relevant wildlife agency (FWS or NMFS). *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" (RPA) that avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If a BiOp concludes that the proposed action (or the action implemented in conjunction with actions described in the RPA) will cause incidental taking of protected species, but that despite this taking, the action will not jeopardize the species or threaten critical habitat, the wildlife agency

> shall provide the Federal agency and the applicant concerned, if any with a written statement that—
>
> (i) specifies the impact of such incidental taking on the species,
>
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
>
> (iii) . . . , and
>
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

*Id*. § 1536(b)(4). This required written statement, with its "reasonable and prudent measures" (RPMs) and associated terms and conditions, is referred to as an "Incidental Take Statement"

---

2008). NMFS is granted jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*.

(ITS), which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. *Id*. § 1536(o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

### B. Injunctive Relief

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).[2] In general, preliminary injunctions are intended to "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025) (citations omitted).

When seeking a preliminary injunction, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (indicating the sliding scale test remains viable after *Winter*, and the district court did not err in applying it). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*.; *see also Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1057-58 (9th Cir. 2007) (explaining "the relationship between success on the merits and irreparable harm [is] a sliding scale in which the required degree of irreparable harm increases as

---

[2] The standard applicable to a request for a temporary restraining order is the same as that for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001).

the probability of success decreases," but that "a moving party must, at an 'irreducible minimum' demonstrate some chance of success on the merits"). "Serious questions" are ones "that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Flathead*, 98 F.4th at 1192 (internal quotations and citations omitted)." They "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id*. (evaluating court's application of serious questions standard for abuse of discretion.

Preliminary injunctions may be mandatory or prohibitory. *N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). A mandatory injunction is one that orders a party to "take action," while a prohibitory injunction is one that "restrains" a party from further action and "aims at simply maintaining the status quo." *N.D.*, 102 F.4th at 992; *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996). The Ninth Circuit observed that "courts should be extremely cautious about issuing a preliminary injunction" when the requested mandatory relief "goes well beyond maintaining the status quo." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) (citation omitted). Thus, parties seeking a mandatory injunction must establish "the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (emphasis in original).

## III.   BACKGROUND[3]

Together, the CVP and SWP "provide water to more than 25 million agricultural and domestic consumers in central and southern California." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 984 (9th Cir. 2014).[4] "Although the Projects provide substantial benefits

---

[3] In the interest of expedience, the Court provides here only that background information which is most essential to explaining and understanding its reasoning herein. Orders issued in related cases in 2022, 2023, and 2024 provide additional, highly detailed background. *See Pac. Coast Fed'n of Fishermen's Assn's v. Raimondo*, 1:20-CV-00426 JLT EPG, 2024 WL 1332516, at *2 (E.D. Cal. Mar. 28, 2024); *Pac. Coast Fed'n of Fishermen's Assn's v. Raimondo*, No. 1:20-CV-00426 JLT EPG, 2023 WL 2228173, at *1 (E.D. Cal. Feb. 24, 2023); *Pac. Coast Fed'n of Fishermen's Assn's v. Raimondo*, No. 1:20-CV-00426 DAD EPG, 2022 WL 789122 (E.D. Cal. Mar. 11, 2022). To fully understand the reasoning presented below, a review of those prior orders is recommended.

[4] The Court also recently permitted several sets of entities who use water from the CVP and/or SWP parties to permissively intervene. (Doc. 56.)

to people and to state agriculture, they arguably harm species native to the Delta by modifying those species' natural habitats." *Id*. at 986. As a result, the Projects, which are operated in coordination with one another, have long been subject to constraints imposed by a series of BiOps addressing Project impacts on listed species. *Id*. at 988 (citing 16 U.S.C. § 1536(a)(2)).

NMFS's 2024 BiOp[5], which addresses the impact of Project operations on several anadromous fish species and marine mammals, ultimately concludes that the Projects will not jeopardize (or destroy or adversely modify designated critical habitat of) any of those species, including, as most relevant to this motion, the endangered Sacramento River winter-run Chinook salmon. (*See* generally BiOp at 2.) Winter-run migrate up the Sacramento River to spawn, but their natural migration pattern is "completely blocked by the Keswick Dam, which regulates river flows downstream of Shasta Dam." (Declaration of Jonathan Rosenfield, Doc. 47-3, ¶ 35.) As a result, spawning habitat for the sole remaining winter-run population is "constrained every year to the area downstream of Keswick" and thus the survival of winter run eggs deposited in the Sacramento River is dependent on the release of sufficient cold water by Project operators. (*See id*.)

To reach its "no jeopardy" conclusion, the 2024 BiOp relied on the fact that Reclamation incorporated into its operational plans various mechanisms intended to limit species-related impacts. (*See generally id.* 27–31.) Because it is impossible to operate the Projects in a manner that entirely avoids impacts to listed species, the 2024 BiOp includes an ITS that specifies the amount of incidental take anticipated to result from various aspects of Project operations (*see id*. at 888–903) and then imposes certain measures and conditions on the Project. (*See id*. at 903–911.)

As relevant here, the ITS assumes Reclamation will implement a new temperature and flow management framework for Shasta Dam and Reservoir described in Reclamation's Proposed

---

[5] The complete text of the 2024 BiOp is available at: https://s3.amazonaws.com/media.fisheries.noaa.gov/2024-12/lto-biological-opinion-appendices-2024.pdf (last visited July 1, 2026). The court may take judicial notice of the BiOp and other decision documents like it "for the purpose of determining what statements are contained therein, not to prove the truth of the contents or any party's assertion of what the contents mean." *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004).

Action[6], designed "to provide increased drought protection and maximize suitable temperature regimes for [the ESA listed Sacramento River] winter-run Chinook salmon." (2024 BiOp at 799–800.) The so-called "Shasta Framework" uses a system of management "Bins" to develop a temperature management plan (TMP) to "administer water temperature and storage levels." (*Id.* at 283.) "Bin assignments begin in February, and are updated monthly as needed through mid-April, after which adjustments will require coordination with [the Shasta Operations Team]." (*Id.*) Reclamation generally designates the Bin in April according to a combination of factors including the amount of water in Shasta Reservoir at the end of April (EOA) and estimates of how much water likely will remain in Shasta Reservoir at the end of September (EOS). (Doc. 46, ¶ 89; 2024 BiOp at 283–87.)

> There are three Bins (1, 2, and 3) based on the expected EOA storage. Each Bin has two categories: A (standard) and B (drought protection). As the proposed action describes (U.S. Bureau of Reclamation 2023-2024), the letter of the Bin (A or B) is primarily driven by the expected demands on the reservoir which are a function of hydrology, meteorology, system-wide conditions, contractual requirements and other conditions.

(*Id.* at 284.) More specifically, the BiOp instructs Reclamation to use its February, March, and April "90% exceedance" forecasts of water supply to identify the Bin, which is updated "as needed through mid-April." (BiOp 284; Doc. 50-10, para 11-15.) In April, Reclamation then promulgates a draft TMP based on the identified Bin, which Reclamation will finalize in May or later in coordination with other managers. (BiOp at 284.)

---

[6] The 2024 BiOp evaluated Project impacts by examining Reclamation's proposed operations (referenced in the record and herein as the "Proposed Action") as set forth in Appendix A to the BiOp. In December 2024, Reclamation adopted a Record of Decision ("2024 ROD") that incorporated the terms of the 2024 BiOp. *See Pac. Coast Fed'n of Fishermen's Ass'ns, et al. v. Lutnick*, et al., E.D. Cal., Case No. 1:20-cv-00431-JLT-EPG, Doc. 538 (filed Dec. 27, 2024). In December 2025, Reclamation issued a new Record of Decision ("Action 5 ROD") adopting an updated operations plan known as "Action 5" for the long-term operation of the CVP (*see* Doc. 22-1 at 61–95), designed at least in part to implement Executive Order 14181. (*Id.* at 64.) That Executive Order, issued shortly after President Trump began his second term, directs Reclamation to consider actions to "maximize" contractual water allocations. (*See* Doc. 22-1 at 53–56.) Though Plaintiffs argue the Action 5 ROD "openly announced it would operate the CVP, and therefore also Shasta Dam and reservoir, differently than what was considered or authorized by NMFS through the 2024 biological opinion and in a manner that is less protective of affected species like Sacramento River winter-run Chinook Salmon" (Doc. 47-1 at 21), it is not yet clear to the Court how Action 5 made operational changes material to the present motion. (*See* Doc. 50 at 10 (arguing that Action 5 "had to do with operations specific to the Delta, not the operations of Shasta Reservoir").)

The BiOp's description of the Shasta Framework made use of a Figure and a Table to summarize relevant information. First, Figure 54 presents a "Decision Tree for Shasta Management Bin [Selection3.7]":

(Doc. 47-2 at 181[7]; *see also* 2024 BiOp at 285.)

The BiOp next presents Table 25, titled "Shasta Management Framework Goals, Objectives, and Indicators.

| | Bin 1A | Bin 1B | Bin 2A | Bin 2B | Bin 3A | Bin 3B |
|---|---|---|---|---|---|---|
| **Estimated Frequency** | 80% of Years | | ~11.5% of Years | | ~8.5% of Years | |
| **Biological Objective** | Enhance | | Recover | Maintain | Protect | |

[7] The Court presents here a version of this Figure, provided at Doc. 47-2 at 181, that corrects a typo in the version of the same Figure used in the 2024 BiOp. The correction was published later, but no party seems to dispute the corrected version controls. This is not to say that the parties agree as to how the Decision Tree should operate. As set forth below, while Reclamation appears to interpret the "Est. EOSep Storage" diamonds as a reference to the bare results of their 90% exceedance forecasts, Plaintiffs appear to contend that Reclamation must take into consideration all available mechanisms to reach Estimated EOS levels before Reclamation can make a Bin designation.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Biological Goals** | · Maximize species recruitment opportunities · Increase spatial diversity · Maximize floodplain linkages · Enhance ecological flows · Increase available habitat for fall-run Chinook salmon in the fall and winter months | | · Maintain or maximize species recruitment opportunities with some reduction in spawning habitat compared to Bin 1 · Maintain or restore river function and key floodplain linkages · Restore key ecological flows | | · Avoid critical loss of population · Maintain key refuges of spawning and early rearing habitat · Avoid catastrophic changes to habitat and impacts to the broodyear | |
| **Temperature Management for Sacramento River winter-run Chinook salmon** | Manage spawning habitat | | Manage the majority of spawning habitat | | Manage spawning habitat during the critical periods of the spawning and egg incubation period | |
| **Temperature Target** | average daily water temperature of 53.5°F | | | | | |
| **Compliance Point** | Downstream of the CCR gauge | | At the CCR gauge | | Upstream of the CCR gauge | |
| **Temperature Dependent Mortality Target** | ≤3% | | | | ≤30% | |
| **EOA (MAF)** | ≥ 3.7 | | 3.0-3.7 | | <3.0 | |
| **EOS (MAF)** | ≥ 3.0 | ≥ 2.4 | 2.2-2.4 | 2.0-2.2 | >2.0 | <2.0 |
| **Hydrologic Goal** | | Initiate drought protection | | Increase drought protection | | Increase drought protection |
| **Operational Goals** | | Increase EOS ≥ 2.4 MAF. If impossible, shift into Bin 2A. | Increase EOS >2.2 MAF. If impossible, shift into Bin 2B. | Increase EOS >2.0 MAF. If impossible, shift into Bin 3A. | Increase EOS >2.2 MAF. If impossible shift to Bin 3B. | Increase EOS >2.0 MAF. If impossible identify system priorities and contingencies. |
| **Operational Goals and Objectives** | • Maintain sufficient storage for drought protection should the next year be dry • Limit early season October through December spill to the maximum extent possible • Deliver available water while meeting regulatory requirements and obligations to senior water right holders under the Sacramento River Settlement Contracts | | | | • Maintain and conserve minimal storage to avoid low storages should the next year also be dry • Meet public health and safety demands including Delta salinity standards • Meet obligations to senior water right holders under the Sacramento River Settlement Contracts | |

9

EOA = End-of-April Storage; EOS = End-of-September Storage; MAF = Million Acre-Feet; CCR = Sacramento River Above Clear Creek gauge

(2024 BiOp at 285–87.)

As Table 25 indicates, modeling suggests 80% of years will be Bin 1 years; 11.5% of years will be Bin 2 years; and 8.5% of years will be Bin 3 years. (*Id*.; *see also id*. at 889 (confirming that Bin 3 years are expected to occur in fewer than 10 % of years).) The BiOp's ITS indicates that NMFS anticipates temperature related egg mortality, referred to in the record as "temperature dependent mortality" or "TDM", of Sacramento River winter-run Chinook salmon under the Shasta Framework to be as follows:

- Bin 1A – The amount and extent of anticipated take is framed around the Bin 1B objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31 at or downstream of the CCR gage, which is expected to result in a TDM of ≤3 percent

- Bin 1B – The amount and extent of anticipated take is framed around the Bin 1B objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31 at or downstream of the CCR gage, which is expected to result in a TDM of ≤3 percent (i.e., same as for Bin 1A)

- Bin 2A – The amount and extent of anticipated take is framed around the Bin 2A objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31 at the CCR gage, which is expected to result in a TDM of ≤3 percent with up to a 10-percent deviation if it is incorporated through consensus into an annual TMP

- Bin 2B – The amount and extent of anticipated take is framed around the Bin 2B objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31 at the CCR gage which is expected to result in a TDM of ≤3 percent at the CCR gage with up to a 10-percent deviation if it is incorporated through consensus into an annual TMP (i.e., same as for Bin 2A)

- Bin 3A – The amount and extent of take is framed around the Bin 3A objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31, upstream from the CCR gage, which is expected to result in a TDM of ≤30 percent with a 1-year deviation of up to 10 percent if it is incorporated through consensus into an annual TMP

- Bin 3B - The amount and extent of take is framed around the Bin 3B objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31, upstream from the CCR gage, which is expected to result in a TDM of ≤30 percent with a 1-year deviation of up to 10 percent if it is incorporated

10

through consensus into an annual TMP[.]

2024 BiOp at 891. NMFS stated that it "anticipates[8] the following conditions would indicate an exceedance of the amount and extent of incidental take":

- The amount and extent of anticipated incidental take will be exceeded if there are 2 consecutive Bin 3B years where TDM exceeds the objective of 30 percent, or,

- The amount and extent of anticipated incidental take will be exceeded if there are 2 consecutive Bin 3 years (either both Bin 3A or a combination of Bin 3A and Bin 3B years) that are accompanied by the JPE subteam making a determination in that second year, through a broodyear assessment, that SR winter-run Chinook salmon are in an "adverse condition" as defined in the proposed action

(*Id.*)

Relatedly, NMFS imposed several "terms and conditions" for the Shasta Division, including:

c. If the biological objectives of a Bin are exceeded, Reclamation, in coordination with NMFS, shall initiate an independent review of operations to determine if there were discretionary actions that could have been taken by Reclamation to meet the biological objectives. The review shall be initiated in November with a draft report available in March so that any recommendations can be considered for incorporation into the next year's TMP.

d. If there are two consecutive Bin 3 years in a row, the SHOT will convene to conduct a full review of conditions and operations and will make a recommendation to the Directors Group on whether reinitiation is warranted or if other operational actions could be taken to prevent a third consecutive Bin 3 year. The SHOT may also work with the WRAP policy team to update the WRAP actions and make recommendations to the Directors Group for implementation and addressing potential barriers to implementation. The SHOT may also recommend an independent review of operations and WRAP actions and request recommendations for adjusting operations and WRAP actions that may be necessary to protect SR winter-run Chinook salmon survival and viability.

(2024 BiOp at 904.) Overall, the ITS appears to apply a long time horizon to its evaluation of the ongoing impacts of Shasta Dam operations, given that it does not articulate a take limit directly connected to Bins 1 or 2 but instead calls for a formal review after the fact whenever the

---

[8] The Court is not entirely sure why the ITS uses this language in the context of describing the incidental take limit.

biological objectives of any Bin are exceeded. Notably, no person or entity has challenged the legality of the 2024 BiOp or its ITS. (*See* Doc. 47-1 at 14.)

It is undisputed that in the relevant geographic area of California, this past winter was "mild for the most part with only a few periods of heavy wetness" and that "consequently, Shasta storage is above average but the cold water pool" behind the Dam that is available for temperature management on the Sacramento River is "blow average." (Doc. 50-6 at 5.) In its April 29, 2026 Draft TMP, Reclamation indicated its intent to identify 2026 as a Bin 2A year "based on the April 90% exceedance forecast" because "[a]lthough Shasta storage was forecast greater than 3.7 MAF at the end of April, the CVP's April 90% exceedance forecast of operations estimates 2.2 MAF at end of September." (*Id*. at 7.)

Various entities, including Plaintiffs, the California Department of Fish and Wildlife, and the California State Water Resources Control Board objected to the draft TMP and argued that it did not comport with the requirements of the 2024 BiOp's Bin designation scheme, Doc. 47-2 at 216 –17 (Plaintiffs objecting that the designation violates the requirements of the 2024 BiOp), or at the very least did not reflect the result they expected from the Shasta Framework under the circumstances, namely a Bin 1B designation. (*See id*. at 223 (CDFW commenting that "it was assumed that 2026 would result in a Bin 1 year and that reclamation would balance the system to meet an [EOS] storage target of >2.4 MAF."); *id*. at 228 (similar comment from State Board).) The State Board, which must review and approve the final TMP in light of state law requirements imposed on the Projects, requested that the final TMP include additional measures that "are more likely to result in favorable temperature management conditions for winter-run and fall-run Chinook salmon, which could include higher EOS carryover storage." (*Id*. at 228.) The State Board also requested a variety of additional information, including about how Reclamation determined the EOS carryover storage volume and how that determination is consistent with the 2024 BiOp and 2025 ROD." (*Id*. at 228–29.)

On May 29, 2026, Reclamation produced its final TMP, which again designated the water year Bin 2A. (Doc. 50-3.) On June 10, 2026, the State Board formally rejected the final TMP without prejudice to resubmittal, reiterating the Board staff's "previous understanding" that "the

EOS carryover storage objective for a year such as 2026 would be at least 2.4 MAF based on the end of April (EOA of 4.2 MAF" and because a higher EOS of 2.4 MAF "would improve conditions this year for winter-run and fall-run Chinook salmon, and would provide better conditions going into next year, particularly if next year is dry." (Doc. 47-2 at 299-303.)

Plaintiffs gave notice to Reclamation under the ESA and then filed this lawsuit. (Doc. 46, ¶ 105; Doc. 50-4 (Reclamation's response to Plaintiffs' April 17, 2026 notice).) Plaintiffs' first Claim for Relief alleges Reclamation's operation of the CVP is jeopardizing listed species in violation of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2) because, among other things, Reclamation is operating the Shasta Dam and reservoir without conforming to the Shasta Framework. (Doc. 46, ¶¶ 123–25.) Relatedly, Plaintiffs' second claim for relief alleges that Reclamation is violating the Administrative Procedure Act, 5 U.S.C. § 706(1) by failing to reinitiate consultation "because the amount or extent of taking specified in the incidental take statement [of the 2024 BiOp has been] exceeded." (Doc. 46, ¶ 131 (quoting 50 C.F.R. § 402.16).) The third claim for relief alleges that Reclamation is liable under Section 9 of the ESA, 16 U.S.C. § 1538, because it has violated various incidental take limits for impacted listed species and otherwise abrogated the incidental take coverage of the 2024 BiOp and its ITS. (Doc. 46, ¶¶ 139–143.) The pending motions followed.

**IV.     DISCUSSION**

For purposes of this order, the Court's analysis begins and ends with likelihood of success on the merits. Plaintiffs contend that Reclamation's Bin 2A designation for this water year does not conform to the requirements of the 2024 BiOp. (Doc. 47-1 at 15.) As mentioned, though the Court believes there is support for Plaintiffs' theory, there is also support for Reclamation's reading of the applicable requirements.

Plaintiffs place considerable weight on the following rows of Table 25 from the BiOp, which the Court duplicates here with the relevant headings for ease of reference:

///

///

///

|  | Bin 1A | Bin 1B | Bin 2A | Bin 2B | Bin 3A | Bin 3B |
|---|---|---|---|---|---|---|
| **EOA (MAF)** | $\geq$ 3.7 | | 3.0-3.7 | | <3.0 | |
| **EOS (MAF)** | $\geq$ 3.0 | $\geq$ 2.4 | 2.2-2.4 | 2.0-2.2 | >2.0 | <2.0 |
| **Hydrologic Goal** | | Initiate drought protection | | Increase drought protection | | Increase drought protection |
| **Operational Goals** | | Increase EOS $\geq$ 2.4 MAF. If impossible, shift into Bin 2A. | Increase EOS >2.2 MAF. If impossible, shift into Bin 2B. | Increase EOS >2.0 MAF. If impossible, shift into Bin 3A. | Increase EOS >2.2 MAF. If impossible shift to Bin 3B. | Increase EOS >2.0 MAF. If impossible identify system priorities and contingencies. |

(2024 BiOp at 286). Plaintiffs argue that per this Table, when there is 3.7 MAF of water in Shasta at the end of April it is *by definition* a Bin 1 year. (Doc. 47-1 at 13; Rosenfield Decl., ¶ 59.) Indeed, the row labeled "EOA (MAF)" categorizes any year with EOA storage of 3.7 or more as a Bin 1 year because it *caps* Bin 2 years at 3.7 MAF by indicating EOA for Bin 2 years must fall within the 3.0 – 3.7 MAF range. Using this row's categorization scheme as a foundation, Plaintiffs argue that this year cannot be a Bin 2 year unless the requirements of the final line of the table excerpt are satisfied, allowing a shift from Bin 1 into Bin 2A only if maintaining EOS at or above 2.4 is "impossible." (Rosenfield Decl. ¶ 63.) Put another way, in a year like this one where EOA storage exceeds 3.7 MAF, Plaintiffs read the last line of this table to mean that Reclamation <u>must</u> examine whether it is possible to increase EOS storage to at least 2.4 MAF <u>before</u> declaring a Bin 2A year.[9]

However, Table 25 describes itself as being "summarized from (U.S. Bureau of Reclamation 2023-2024)," (2024 BiOp at 285), which is a reference to Reclamation's description of the Shasta Framework in its Proposed Action. The Proposed Action defines the Bins slightly

---

[9] According to Plaintiffs, Reclamation has failed to demonstrate that it is impossible to increase EOS to 2.4 MAF this year and, thus, it is unlawful for Reclamation to designate 2026 as a Bin 2A year. (*See* Rosenfeld Decl., ¶ 63.) Reclamation does not directly dispute this—at least not on the present record. In fact, the record contains modeling from the Southwest Fisheries Science Center, a branch of NMFS, that appears to suggest retaining an additional 200,000 AF of water in Shasta is at least theoretically possible. (*See* Rosenfeld Decl., ¶ 72.)

14

differently:

- Bin 1A is defined as having an end of April storage at or above 3.7 MAF and a projected end of September storage of at least 3.0 MAF.

- Bin 1B is defined as having an end of April storage at or above 3.7 MAF and a projected end of September storage of at least 2.4 MAF.

- Bin 2A is defined as having an end of April storage *at or above 3.0 MAF* and a projected end of September storage of at least 2.2 MAF.

- Bin 2B is defined as having an end of April storage at or above 3.0 MAF and a projected end of September storage of at least 2.0 MAF.

- Bin 3A is defined as having an end of April storage below 3.0 MAF and a projected end of September storage greater than 2.0 MAF.

- Bin 3B is defined as having an end of April storage below 3.0 MAF and a projected end of September storage less than 2.0 MAF.

(Proposed Action, 3-16–3-21 (emphasis added).) Notably, as emphasized, the Proposed Action does not cap Bin 2A years at 3.7 MAF and thus does not articulate an intent to force every year in which EOA storage is above 3.7 MAF into Bin 1. Rather, the Proposed Action appears to allow what Reclamation has done here: make an initial designation of Bin 2A where EOA storage is above 3.7 MAF but projected EOS storage is below 2.4 MAF.

In this way, the definitions articulated in the Proposed Action are arguably more consistent with the Decision Tree, the straightforward application of which appears to reach a Bin 2-year result when the April 90% exceedance forecast for a particular water year exceeds 3.7 MAF but the *projected* EOS is less than 2.4 MAF. Reclamations' conduct is consistent with this plain reading application of the Decision Tree. Reclamation's April 90% exceedance forecast, dated April 21, 2026, indicated that EOA storage would be 4.2 MAF and *estimated* as of the date of that forecast that EOS storage would be 2.205 MAF. (Doc. 50-10 at 27.) Applying those volumes to the Decision Tree starting in the upper right corner, causes the answer to be "Yes" at the first branch, followed by "No" at the second branch, and again "No" at the third branch, which leads to the result that the water year is Bin 2A.

15

Crucially, nothing in the BiOp suggests NMFS intended to modify the Shasta Framework as it is described in the Proposed Action. Rather, it appears that Table 25 may have incorrectly summarized the EOA ranges articulated by the Proposed Action. Thus, to the extent Plaintiffs are relying on Table 25, that reliance is at the very least in conflict with other parts of the record, including the Bin definitions in the Proposed Action and the Decision Tree.

Plaintiffs appear to be attempting to make at least one other, more nuanced argument about the Shasta Framework. The Proposed Action provides the following detailed description of Bin 1B, a portion of which (see underlined text) has already been quoted above:

> Bin 1B is typically a result of a good water year but the system may be slightly stressed, or the water supply may be less than what is seen under Bin 1A. <u>Bin 1B is defined as having an end of April storage at or above 3.7 MAF and a projected end of September storage of at least 2.4 MAF.</u> Consistent with Bin 1A years, this EOA storage ensures good temperature management through providing access to using the upper gates of the TCD. The EOS storage of 2.4 MAF provides a high likelihood of EOA storage greater than 2.8 MAF the following year which is a point at which biological impacts from higher temperatures start to increase significantly. An EOS storage of 2.4 MAF along with the higher fall/winter minimum flows also lessens the potential for fall/early winter flood control releases, although these releases are still expected to occur under wetter hydrology. Similar to Bin 1A, Reclamation, through coordination with SRG and the SHOT, will analyze tradeoffs of establishing downstream temperature locations that support the biological goal of maximizing suitable habitat and the risk of running out of cold water. Reclamation will consider light system tradeoffs for supporting higher Shasta storage (up to 3.0 MAF) with minimal impacts to other parts of the system during their monthly forecasting process. If there are tradeoffs with higher impacts that should be considered to meet the Bin 1 Shasta EOS storage range, Reclamation will consider these through coordination with the SHOT. Available actions primarily include rebalancing between other CVP reservoirs while maintaining all operational goals. If available actions result in storage of 2.4-3.0 MAF, then no further actions would be pursued. ***If available actions are not sufficient to result in a storage of at least 2.4 MAF, then this year would be reclassified as Bin 2A.***

(Proposed Action at 3-16–3-17 (emphasis added).) Approximately one page later, in a sub-section entitled "Bin 1 Operational Goals and Indicators," the Proposed Action also states: "The goal of actions is to increase projected EOS storage above 2.4 MAF. If this is not possible, shift to Bin 2A." Dr. Rosenfield appears to reference this line (Rosenfield Decl., ¶ 63), presumably as further support for Plaintiffs' theory that Reclamation must take any available steps to adjust its EOS

projections to reach 2.4 MAF before giving up on Bin 1. Indeed, the use of the word "projected" in that sentence somewhat supports such an interpretation. But when this line is read in the context of the entire Bin 1B description, including the paragraph quoted above, the Court is not so sure. First, as mentioned, the Bin 1B description defines Bin 1B "as having an end of April storage at or above 3.7 MAF and a *projected* end of September storage of at least 2.4 MAF." The text then discusses the use of actions to "result" in EOS storage of at least 2.4 MAF. Should available actions prove insufficient to accomplish this, then the water year would need to be "re-classified" (as opposed to initially classified) as Bin 2A, triggering, among other things, possible reductions in water supply. (*See* Proposed Action at 3-18.) All this at least plausibly suggests that the BiOp, by relying on the Proposed Action, anticipated the very stepped process Reclamation has implemented here, namely that Reclamation would use the April 90% forecast to set the Bin, the EOS "operational goals" of which Reclamation must abide by unless "available actions" (which become more aggressive as the Bin number increases) are insufficient to ensure that the the "result" of Project operations is actual EOS storage at or above the goal.

It may be that Reclamation's interpretation of the BiOp's requirements is ultimately in conflict with the overall goals of the BiOp and that this conflict may inform the Court's evaluation of the parties' positions, but this is not entirely clear, given that the Proposed Action, which the BiOp ultimately approved, is designed to serve multiple purposes. Moreover, given how complex the temperature management planning process is, it may not be practical to interpret the BiOp as requiring Reclamation to front-load consideration of the kinds of actions and tradeoffs contemplated in the Bin 1B description quoted above. In other words, if it takes months to generate a temperature management plan based on the initial Bin designation, as Reclamation's expert contends (see Doc. 50-10, ¶ 30), would Reclamation's Proposed Action ever have intended to make the initial Bin designation a moving target by default?

The bottom line is that the Court cannot readily determine on this record whether Plaintiffs' interpretation of the BiOp's requirements is superior to or even competitive with Reclamation's. Thus, the Court cannot find either likely success on the merits or a "serious question" at this time. *See Flathead*, 98 F.4th at 1192 (serious question "must involve a fair

17

chance of success on the merits"). For one thing, parties only offer very basic applicable legal standards, such as the unsurprising proposition that an agency abrogates the protective effect of a BiOp when it fails to implement its terms. (*See* Doc. 47 at 19 (citing *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1108–15 (9th Cir. 2012)); *see also* Doc. 51 at 9 (State Water Contractors conceding that the ITS sets forth terms and conditions that "must be complied with by the Federal agency" under 16 U.S.C. § 1536(b)(4)(C)(iv)).) But the situation here requires more nuance because there may be inconsistencies in and possibly multiple reasonable interpretations of the BiOp and ITS. Given the accelerated timeline of the TRO request, the Court's limited independent research has not proved particularly fruitful, uncovering cases that seem only tangentially relevant. For example, when one district court considered an argument that an ITS was *invalid* because it was ambiguous, the relevant wildlife agency attempted to clarify the language through an official deposition, but the court nonetheless found the ITS invalid because it failed to set a clear take limit. *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047, 1063 (D. Mont. 2018). *WildEarth* does not shed much light on the situation presented here, where Plaintiffs are not challenging the *validity* of the ITS but rather are advancing one interpretation of the ITS's requirements in face of a contrary one. Moreover, the present record does not contain an official interpretation of the BiOp's terms, though the Court notes that one comment letter suggests such an interpretation may be forthcoming. (Doc. 47-2 at 228.)

///

///

///

///

///

///

///

///

///

///

## V.   CONCLUSION AND ORDER

Given that Plaintiffs have the burden on this motion, the Court concludes that the request for a TRO must be denied. However, because briefing on the motion for a preliminary injunction is ongoing, the parties may be able to provide further guidance on these issues. Thus, this ruling is without prejudice to a further showing. The Court directs the parties meet and confer at their earliest opportunities to discuss ways to incorporate briefing on the relevant legal standards into the existing schedule for the pending motion.

IT IS SO ORDERED.

Dated:  _July 9, 2026_     _____
                                              UNITED STATES DISTRICT JUDGE