**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, et al., | Case No. 2:26-cv-0671 JLT EPG |
| Plaintiffs, | ORDER DENYING REQUEST FOR PRELIMINARY INJUNCTION |
| v. | (Doc. 47) |
| U.S. BUREAU OF RECLAMATION, et al., | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiffs, a pair of environmental organizations interested in the health of California's San Francisco Bay, the Sacramento-San Joaquin Delta, and the species that reside in or transit through the Bay-Delta watershed, bring this lawsuit against the U.S. Bureau of Reclamation and the National Marine Fisheries Service (NMFS), as well as various official representatives of those agencies. (Doc. 46 (FAC).) Reclamation operates the federal Central Valley Project (CVP), "one of the largest water infrastructure and conveyance systems in the United States." (*Id*., ¶ 1.)

On June 24, 2026, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction concerning Reclamation's planned operations for Shasta Dam and Reservoir for the remainder of the summer and early fall of 2026. (Doc. 47.) Plaintiffs contend that those plans do not comport with the requirements of a 2024 Endangered Species Act

biological opinion ("BiOp") applicable to the joint operation of the CVP (of which Shasta Dam is one component) and California's State Water Project (SWP) (Collectively, the "Projects"). (*See generally* Doc. 47-1 at 21 (describing Reclamation's conduct as an "open violation").) Plaintiffs requested two forms of immediate relief in the form of a TRO that: requires Reclamation to reduce releases from Shasta and directs the U.S. Bureau of Reclamation to prepare an alternative plan for operation of Shasta through the summer and early fall of this water year. (*See* Doc. 47-7.) Plaintiffs' proposed preliminary injunction built upon the TRO request by seeking Court approval of any alternative Shasta operations plan ordered by the Court and an order requiring Reclamation to operate "in conformance with the requirements" of the BiOp for "Bin 1" including that Reclamation "target storing at least 2.4 million-acre-feet of water in Shasta Reservoir at the end of September and manage the dam and reservoir to ensure that average daily water temperatures in the Sacramento River stay at or below 53.5° Fahrenheit downstream from the Clear Creek Guage throughout the Temperature Management Season." (Doc. 47-8.)

On July 9, 2026, the Court denied the TRO request without prejudice, subject to further development of the record in briefing on the preliminary injunction motion. (Doc. 61.) As the Court explained in its July 9 Order:

> Though Plaintiffs advance a colorable reading [of] the 2024 BiOp's requirements, Reclamation's own reading is not obviously unreasonable. Because no party presents arguments related to or articulates standards governing how the Court should resolve a dispute about *interpretation* of the terms of the BiOp under remotely analogous circumstances, the Court concludes that it cannot *on this record* find that Plaintiffs are likely to succeed or that they have a "fair chance" at success on the merits sufficient to trigger the "serious questions" injunctive relief standard.

(*Id*. at 2.) The parties have now addressed the legal standard, further developed their positions on the nature of the proposed injunctive relief, articulated additional arguments related to the merits, and expanded the record related to the other injunctive relief factors. Having considered the entire record presented thus far, the Court concludes the requested relief is mandatory in nature and thus requires a heightened showing. With that in mind, though the text of the BiOp contains language that supports Plaintiffs' position, because the interpretation of the Framework advanced by Reclamation here is consistent with how it was described in the Proposed Action, the design of

2

which was unaltered in the BiOp, the Court again finds that Plaintiffs have not met their burden to establish entitlement to injunctive relief.

The Court acknowledges that the most up-to-date temperature modeling suggests that impacts to incubating salmonid eggs in the upper Sacramento River are likely to be more severe than managers anticipated earlier in the season. However concerning, this fact does not on its own empower the Court to act in the absence of a sufficiently strong showing on the merits of the claim that forms the foundation of the present motion. For these reasons, as explained in greater detail below, the motion is **DENIED**.

## II.    LEGAL FRAMEWORK

### A.    The Endangered Species Act

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (citing 16 U.S.C. § 1533). FWS and NMFS administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). Most pertinent to this case are Section 7, 16 U.S.C. § 1536, and Section 9, 16 U.S.C. § 1538, of the ESA. Section 7(a)(2) imposes a procedural duty on the federal agencies to consult with the U.S. Fish and Wildlife Service (FWS) or NMFS, depending on the protected species,[1] to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16 U.S.C. § 1536(a)(2). An agency "action" is defined to mean all activities carried out by federal agencies, including, among other things, the granting of licenses and permits. *See* 50 C.F.R. § 402.02. "If a contemplated agency action may affect a listed species, then the agency must consult with the Secretary of the Interior, either

---

[1] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1120 n. 1 (E.D. Cal. 2008), *as corrected* (Oct. 31, 2008). NMFS is granted jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id.*

formally or informally." *Am. Rivers v. NMFS*, 126 F.3d 1118, 1122 (9th Cir. 1997).

Formal consultation results in the issuance of a BiOp by the relevant wildlife agency (FWS or NMFS). *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" (RPA) that avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If a BiOp concludes that the proposed action (or the action implemented in conjunction with actions described in the RPA) will cause incidental taking of protected species, but that despite this taking, the action will not jeopardize the species or threaten critical habitat, the wildlife agency

> shall provide the Federal agency and the applicant concerned, if any with a written statement that—
>
> (i) specifies the impact of such incidental taking on the species,
>
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
>
> (iii) . . . , and
>
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

*Id*. § 1536(b)(4). This required written statement, with its "reasonable and prudent measures" (RPMs) and associated terms and conditions, is referred to as an "Incidental Take Statement" (ITS), which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. *Id*. § 1536(o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999); *see also WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047, 1061 (D. Mont. 2018) ("[An ITS] specifies the impact of incidental take, reasonable and prudent measures designed to minimize the impact of take, and terms and conditions to implement those measures. 16 U.S.C. § 1536(b)(4)(i)–(iv). Take that complies with the statement's terms and conditions is not prohibited. 16 U.S.C. § 1536(o)(2). The action agency must reinitiate consultation if take is exceeded or if new information or a modification to the

action indicates previously unexamined effects. 50 C.F.R. § 402.16.").

**B.      Injunctive Relief**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). In general, preliminary injunctions are intended to "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025) (citations omitted).

When seeking a preliminary injunction, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (indicating the sliding scale test remains viable after *Winter*, and the district court did not err in applying it). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*.; *see also Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1057-58 (9th Cir. 2007) (explaining "the relationship between success on the merits and irreparable harm [is] a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases," but that "a moving party must, at an 'irreducible minimum' demonstrate some chance of success on the merits"). "Serious questions" are ones "that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Flathead*, 98 F.4th at1192 (internal quotations and citations omitted)."

They "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id*. (evaluating court's application of serious questions standard for abuse of discretion.

## III. BACKGROUND[2]

Together, the CVP and SWP "provide water to more than 25 million agricultural and domestic consumers in central and southern California." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 984 (9th Cir. 2014). "Although the Projects provide substantial benefits to people and to state agriculture, they arguably harm species native to the Delta by modifying those species' natural habitats." *Id*. at 986. As a result, the Projects, which are operated in coordination with one another, have long been subject to constraints imposed by a series of BiOps addressing Project impacts on listed species. *Id*. at 988 (citing 16 U.S.C. § 1536(a)(2)).

NMFS's 2024 BiOp[3], which addresses the impact of Project operations on several anadromous fish species and marine mammals, ultimately concludes that the Projects will not jeopardize (or destroy or adversely modify designated critical habitat of) any of those species, including, as most relevant to this motion, the endangered Sacramento River winter-run Chinook salmon. (*See generally* BiOp at 2.) Winter-run migrate up the Sacramento River to spawn, but their natural migration pattern is "completely blocked by the Keswick Dam, which regulates river flows downstream of Shasta Dam." (6/24/26 Declaration of Jonathan Rosenfield, Doc. 47-3, ¶ 35.) As a result, spawning habitat for the sole remaining winter-run population is "constrained every year to the area downstream of Keswick" and thus the survival of winter run eggs deposited

---

[2] In the interest of expedience, the Court provides here only that background information which is most essential to explaining and understanding its reasoning herein. Orders issued in related cases in 2022, 2023, and 2024 provide additional, highly detailed background. *See Pac. Coast Fed'n of Fishermen's Assn's v. Raimondo*, 1:20-CV-00426 JLT EPG, 2024 WL 1332516, at *2 (E.D. Cal. Mar. 28, 2024); *Pac. Coast Fed'n of Fishermen's Assn's v. Raimondo*, No. 1:20-CV-00426 JLT EPG, 2023 WL 2228173, at *1 (E.D. Cal. Feb. 24, 2023); *Pac. Coast Fed'n of Fishermen's Assn's v. Raimondo*, No. 1:20-CV-00426 DAD EPG, 2022 WL 789122 (E.D. Cal. Mar. 11, 2022).

[3] The complete text of the 2024 BiOp is available at: https://s3.amazonaws.com/media.fisheries.noaa.gov/2024-12/lto-biological-opinion-appendices-2024.pdf (last visited Aug. 1, 2026). The Court may take judicial notice of the BiOp and other decision documents like it "for the purpose of determining what statements are contained therein, not to prove the truth of the contents or any party's assertion of what the contents mean." *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004).

in the Sacramento River is dependent on the release of sufficient cold water by Project operators. (*See id*.)

To reach its "no jeopardy" conclusion, the BiOp relied on the fact that Reclamation incorporated into its operational plans various mechanisms intended to limit species-related impacts. (*See generally id.* 27–31.) Because it is impossible to operate the Projects in a manner that entirely avoids impacts to listed species, the BiOp includes an ITS that specifies the amount of incidental take anticipated to result from various aspects of Project operations (*see id*. at 888–903) and then imposes certain measures and conditions on the Project. (*See id*. at 903–911.)

As relevant here, the ITS assumes Reclamation will implement a new temperature and flow management framework for Shasta Dam and Reservoir described in Reclamation's Proposed Action[4], designed "to provide increased drought protection and maximize suitable temperature regimes for [the ESA listed Sacramento River] winter-run Chinook salmon." (BiOp at 799–800.) The so-called "Shasta Framework" uses a system of management "Bins" to develop a temperature management plan (TMP) to "administer water temperature and storage levels." (*Id*. at 283.) "Bin assignments begin in February, and are updated monthly as needed through mid-April, after which adjustments will require coordination with [the Shasta Operations Team]." (*Id*.) Reclamation generally designates the Bin in April according to a combination of factors including the amount of water in Shasta Reservoir at the end of April (EOA) and estimates of how much water likely will remain in Shasta Reservoir at the end of September (EOS). (FAC, ¶ 89; BiOp at 283–87.)

---

[4] The BiOp evaluated Project impacts by examining Reclamation's proposed operations (referenced in the record and herein as the "Proposed Action") as set forth in Appendix A to the BiOp. In December 2024, Reclamation adopted a Record of Decision ("2024 ROD") that incorporated the terms of the BiOp. *See Pac. Coast Fed'n of Fishermen's Ass'ns, et al. v. Lutnick*, et al., E.D. Cal., Case No. 1:20-cv-00431-JLT-EPG, Doc. 538 (filed Dec. 27, 2024). In December 2025, Reclamation issued a new Record of Decision ("Action 5 ROD") adopting an updated operations plan known as "Action 5" for the long-term operation of the CVP (*see* Doc. 22-1 at 61–95), designed at least in part to implement Executive Order 14181. (*Id*. at 64.) That Executive Order, issued shortly after President Trump began his second term, directs Reclamation to consider actions to "maximize" contractual water allocations. (*See* Doc. 22-1 at 53–56.) Though Plaintiffs argue the Action 5 ROD "openly announced it would operate the CVP, and therefore also Shasta Dam and reservoir, differently than what was considered or authorized by NMFS through the 2024 biological opinion and in a manner that is less protective of affected species like Sacramento River winter-run Chinook Salmon" (Doc. 47-1 at 21), it is not clear to the Court how Action 5 made operational changes material to the present motion. (*See* Doc. 50 at 10 (arguing that Action 5 "had to do with operations specific to the Delta, not the operations of Shasta Reservoir").)

7

> There are three Bins (1, 2, and 3) based on the expected EOA storage. Each Bin has two categories: A (standard) and B (drought protection). As the proposed action describes (U.S. Bureau of Reclamation 2023-2024), the letter of the Bin (A or B) is primarily driven by the expected demands on the reservoir which are a function of hydrology, meteorology, system-wide conditions, contractual requirements and other conditions.

(*Id*. at 284.) More specifically, the BiOp instructs Reclamation to use its February, March, and April "90% exceedance" forecasts of water supply to identify the Bin, which is updated "as needed through mid-April." (BiOp 284; Doc. 50-10, para 11-15.) In April, Reclamation then promulgates a draft TMP based on the identified Bin, which Reclamation will finalize in May or later in coordination with other managers. (BiOp at 284.)

The BiOp's description of the Shasta Framework made use of a Figure taken directly from Reclamation's description of the Proposed Action as well as a Table summarizing information from the Proposed Action. First, Figure 54 presents a "Decision Tree for Shasta Management Bin [Selection3.7]":



(Doc. 47-2 at 181[5]; *see also* BiOp at 285.)

---

[5] The Court presents here a version of this Figure, provided at Doc. 47-2 at 181, that corrects a typo in the version of the same Figure used in the BiOp. The correction was published later, but no party seems to dispute the corrected version controls. This is not to say that the parties agree as to how the Decision Tree should operate. As set forth below, while Reclamation appears to interpret the "Est. EOSep Storage" diamonds as a reference to the bare results of their 90% exceedance forecasts, Plaintiffs appear to contend that Reclamation must take into consideration all available mechanisms to reach Estimated EOS levels

The BiOp next presents Table 25, titled "Shasta Management Framework Goals, Objectives, and Indicators.

| | Bin 1A | Bin 1B | Bin 2A | Bin 2B | Bin 3A | Bin 3B |
|---|---|---|---|---|---|---|
| **Estimated Frequency** | 80% of Years | | ~11.5% of Years | | ~8.5% of Years | |
| **Biological Objective** | Enhance | | Recover | Maintain | Protect | |
| **Biological Goals** | · Maximize species recruitment opportunities · Increase spatial diversity · Maximize floodplain linkages · Enhance ecological flows · Increase available habitat for fall-run Chinook salmon in the fall and winter months | | · Maintain or maximize species recruitment opportunities with some reduction in spawning habitat compared to Bin 1 · Maintain or restore river function and key floodplain linkages · Restore key ecological flows | | · Avoid critical loss of population · Maintain key refuges of spawning and early rearing habitat · Avoid catastrophic changes to habitat and impacts to the broodyear | |
| **Temperature Management for Sacramento River winter-run Chinook salmon** | Manage spawning habitat | | Manage the majority of spawning habitat | | Manage spawning habitat during the critical periods of the spawning and egg incubation period | |
| **Temperature Target** | average daily water temperature of 53.5°F | | | | | |
| **Compliance Point** | Downstream of the CCR gauge | | At the CCR gauge | | Upstream of the CCR gauge | |
| **Temperature Dependent Mortality Target** | ≤3% | | | | ≤30% | |
| **EOA (MAF)** | ≥ 3.7 | | 3.0-3.7 | | <3.0 | |
| **EOS (MAF)** | ≥ 3.0 | ≥ 2.4 | 2.2-2.4 | 2.0-2.2 | >2.0 | <2.0 |
| **Hydrologic Goal** | | Initiate drought protection | | Increase drought protection | | Increase drought protection |

before Reclamation can make a Bin designation.

9

| Operational Goals | | Increase EOS ≥ 2.4 MAF. If impossible, shift into Bin 2A. | Increase EOS >2.2 MAF. If impossible, shift into Bin 2B. | Increase EOS >2.0 MAF. If impossible, shift into Bin 3A. | Increase EOS >2.2 MAF. If impossible shift to Bin 3B. | Increase EOS >2.0 MAF. If impossible identify system priorities and contingencies. |
|---|---|---|---|---|---|---|
| Operational Goals and Objectives | • Maintain sufficient storage for drought protection should the next year be dry<br>• Limit early season October through December spill to the maximum extent possible<br>• Deliver available water while meeting regulatory requirements and obligations to senior water right holders under the Sacramento River Settlement Contracts | | | | | • Maintain and conserve minimal storage to avoid low storages should the next year also be dry<br>• Meet public health and safety demands including Delta salinity standards<br>• Meet obligations to senior water right holders under the Sacramento River Settlement Contracts |

EOA = End-of-April Storage; EOS = End-of-September Storage; MAF = Million Acre-Feet; CCR = Sacramento River Above Clear Creek gauge

(BiOp at 285–87.)

As Table 25 indicates, modeling suggests 80% of years will be Bin 1 years; 11.5% of years will be Bin 2 years; and 8.5% of years will be Bin 3 years. (*Id*.; *see also id*. at 889 (confirming that Bin 3 years are expected to occur in fewer than 10 % of years).) The BiOp's ITS indicates that NMFS anticipates temperature related egg mortality, referred to in the record as "temperature dependent mortality" or "TDM", of Sacramento River winter-run Chinook salmon under the Shasta Framework to be as follows:

- Bin 1A – The amount and extent of anticipated take is framed around the Bin 1B objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31 at or downstream of the CCR gage, which is expected to result in a TDM of ≤3 percent

- Bin 1B – The amount and extent of anticipated take is framed around the Bin 1B objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31 at or downstream of the CCR gage, which is expected to result in a TDM of ≤3 percent (i.e., same as for Bin 1A)

- Bin 2A – The amount and extent of anticipated take is framed around the Bin 2A objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31 at the CCR gage, which is expected to result in a TDM of ≤3 percent with up to a 10-percent deviation if it is incorporated through consensus into an annual TMP

- Bin 2B – The amount and extent of anticipated take is framed around the Bin 2B objective of meeting a daily average

10

water temperature of 53.5°F from May 15 through October 31 at the CCR gage which is expected to result in a TDM of ≤3 percent at the CCR gage with up to a 10-percent deviation if it is incorporated through consensus into an annual TMP (i.e., same as for Bin 2A)

- Bin 3A – The amount and extent of take is framed around the Bin 3A objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31, upstream from the CCR gage, which is expected to result in a TDM of ≤30 percent with a 1-year deviation of up to 10 percent if it is incorporated through consensus into an annual TMP

- Bin 3B - The amount and extent of take is framed around the Bin 3B objective of meeting a daily average water temperature of 53.5°F from May 15 through October 31, upstream from the CCR gage, which is expected to result in a TDM of ≤30 percent with a 1-year deviation of up to 10 percent if it is incorporated through consensus into an annual TMP[.]

(BiOp at 891.) NMFS stated that it "anticipates[6] the following conditions would indicate an exceedance of the amount and extent of incidental take":

- The amount and extent of anticipated incidental take will be exceeded if there are 2 consecutive Bin 3B years where TDM exceeds the objective of 30 percent, or,

- The amount and extent of anticipated incidental take will be exceeded if there are 2 consecutive Bin 3 years (either both Bin 3A or a combination of Bin 3A and Bin 3B years) that are accompanied by the JPE subteam making a determination in that second year, through a broodyear assessment, that SR winter-run Chinook salmon are in an "adverse condition" as defined in the proposed action

(*Id*.)

Relatedly, NMFS imposed several "terms and conditions" for the Shasta Division, including:

b. By February of each year, Reclamation shall provide a hindcast report of TDM for SR winter-run Chinook salmon based on realized temperature management. The report shall include performance trends to date and observed range of TDM within Bins.

c. If the biological objectives of a Bin are exceeded, Reclamation, in coordination with NMFS, shall initiate an independent review of operations to determine if there were discretionary actions that could have been taken by Reclamation to meet the biological

---

[6] The Court is not entirely sure why the ITS uses this language in the context of describing the incidental take limit.

objectives. The review shall be initiated in November with a draft report available in March so that any recommendations can be considered for incorporation into the next year's TMP.

d. If there are two consecutive Bin 3 years in a row, the SHOT will convene to conduct a full review of conditions and operations and will make a recommendation to the Directors Group on whether reinitiation is warranted or if other operational actions could be taken to prevent a third consecutive Bin 3 year. The SHOT may also work with the WRAP policy team to update the WRAP actions and make recommendations to the Directors Group for implementation and addressing potential barriers to implementation. The SHOT may also recommend an independent review of operations and WRAP actions and request recommendations for adjusting operations and WRAP actions that may be necessary to protect SR winter-run Chinook salmon survival and viability.

(BiOp at 904.) Overall, the ITS appears to apply a long time horizon to its evaluation of the ongoing impacts of Shasta Dam operations, given that it does not articulate a take limit directly connected to Bins 1 or 2 but instead calls for a formal review after the fact whenever the biological objectives of any Bin are exceeded. Notably, no person or entity has challenged the legality of the BiOp or its ITS. (*See* Doc. 47-1 at 14.)

It is undisputed that in the relevant geographic area of California, this past winter was "mild for the most part with only a few periods of heavy wetness" and that "consequently, Shasta storage is above average but the cold water pool" behind the Dam that is available for temperature management on the Sacramento River is "blow average." (Doc. 50-6 at 5.) In its April 29, 2026 Draft TMP, Reclamation indicated its intent to identify 2026 as a Bin 2A year "based on the April 90% exceedance forecast" because "[a]lthough Shasta storage was forecast greater than 3.7 MAF at the end of April, the CVP's April 90% exceedance forecast of operations estimates 2.2 MAF at end of September." (*Id*. at 7.)

Various entities, including Plaintiffs, the California Department of Fish and Wildlife, and the California State Water Resources Control Board objected to the draft TMP and argued that it did not comport with the requirements of the BiOp's Bin designation scheme, (Doc. 47-2 at 216 – 17 (Plaintiffs objecting that the designation violates the requirements of the BiOp)), or at the very least did not reflect the result they expected from the Shasta Framework under the circumstances, namely a Bin 1B designation. (*See id*. at 223 (CDFW commenting that "it was assumed that 2026

12

would result in a Bin 1 year and that reclamation would balance the system to meet an [EOS] storage target of >2.4 MAF."); *id*. at 228 (similar comment from State Board).) The State Board, which must review and approve the final TMP in light of state law requirements imposed on the Projects, requested that the final TMP include additional measures that "are more likely to result in favorable temperature management conditions for winter-run and fall-run Chinook salmon, which could include higher EOS carryover storage." (*Id*. at 228.) The State Board also requested additional information, including about how Reclamation "determined the EOS carryover storage volume and how that determination is consistent with the 2024 BiOp and 2025 ROD." (*Id*. at 228–29.)

On May 29, 2026, Reclamation produced its Final TMP, which again designated the water year as Bin 2A. (Doc. 50-3.) The Final TMP disclosed modeling runs based on "carcass-derived redd distributions"[7] that forecasted TDM would be between 0.3% and 4.9% depending on the model used. (*Id*. at 8.)[8]

On June 10, 2026, the State Board formally rejected the final TMP without prejudice to resubmittal, reiterating the Board staff's "previous understanding" that "the EOS carryover storage objective for a year such as 2026 would be at least 2.4 MAF based on the end of April (EOA of 4.2 MAF" and because a higher EOS of 2.4 MAF "would improve conditions this year for winter-run and fall-run Chinook salmon, and would provide better conditions going into next year, particularly if next year is dry." (Doc. 47-2 at 299-303.) In its June 10, 2026 letter, the Water Board relied on modeling from NMFS's Southwest Fisheries Science Center (SWFSC) (*see* Doc. 47-2 at 302) released on May 27, 2026, which Plaintiffs' expert opines is the "best available science." (6/24/26 Rosenfield Decl., ¶ 81, n. 6.) The SWFSC modeling, which was based on a dataset collected from aerial surveys, produced estimates of TDM between 6% and 45%. (*See* Doc. 47-2 at 302; Doc. 50-3 at 65–66.) SWFSC also modeled an alternative scenario in

---

[7] "Chinook Salmon adults die after spawning . . . Their eggs incubate for weeks to months in gravel nests, known as redds." (6/24/26 Rosenfield Decl., ¶ 26.) Managers perform annual carcass and redd surveys in the Sacramento River. (*See* BiOp at 67.)

[8] The TDM Estimates discussed here concern winter-run Chinook salmon. TDM among winter-run Chinook salmon is also a "coarse indicator" of temperature impacts to both spring-run Chinook Salmon and fall-run Chinook Salmon spawning in the Sacramento River. (6/24/26 Rosenfield Decl., ¶ 43.)

which releases from Shasta were reduced 200,000 acre-feet below the scenario relied upon by Reclamation to produce the Final TMP. (*See* Doc. 50-3 at 64.) The May 20206 SWFSC modeling predicted that the alternative scenario would reduce TDM to between 4% and 34%. (*Id.*)[9]

On July 10, 2026, Federal Defendants produced a Declaration from Caty Marcinkevage, the Assistant Regional Administrator of NFMS. (Doc. 69-3, ¶ 1.) She states therein that:

> In determining water year 2026 (WY2026) as a Bin 2A year, Reclamation has implemented the bin determination approach of the Shasta Framework for a single year as allowed for and analyzed in NMFS' 2024 biological opinion.
>
> NMFS' understanding of the governance structure described in the 2024 proposed action and analyzed in the 2024 biological opinion allows for Reclamation's single year determination of WY2026 as a Bin 2A year based on assessment of WY2026 end of April storage and projected WY2026 end of September storage.

(*Id.*, ¶¶ 3–4.)

In addition, the record contains updated TDM modeling information from late July 2026. (Doc. 76.) The TDM estimates based upon carcass data as applied to the release scenario adopted by Reclamation in its 2026 TMP had risen to between 2.4% and 19.4%, while the TDM estimates based upon aerial surveys was estimated to between 7.1% and 24%. (Doc. 76-1 at 5; 7/29/26 Declaration of Jonathan Rosenfield, ¶ 7.) Reclamation has also "seen exceedances of daily water temperature" targets at relevant points in the Sacramento River. (7/24/26 Declaration of Levi Johnson, ¶ 4.)

Plaintiffs gave notice to Reclamation under the ESA and then filed this lawsuit. (FAC ¶ 105; Doc. 50-4 (Reclamation's response to Plaintiffs' April 17, 2026 notice).) Plaintiffs' first Claim for Relief alleges Reclamation's operation of the CVP is jeopardizing listed species in violation of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2) because, among other things, Reclamation is operating the Shasta Dam and reservoir without conforming to the Shasta Framework. (FAC, ¶¶ 123–25.) Relatedly, Plaintiffs' second claim for relief alleges that Reclamation is violating the Administrative Procedure Act, 5 U.S.C. § 706(1) by failing to

---

[9] The experts in this case debate which TDM estimates are the most meaningful and whether any of them should be used to gauge how much TDM will occur in any given year. Because the outcome here turns on the merits issues, the Court finds it unnecessary to untangle all of these issues at this time.

reinitiate consultation "because the amount or extent of taking specified in the incidental take statement [of the 2024 BiOp has been] exceeded." (FAC, ¶ 131 (quoting 50 C.F.R. § 402.16).) The third claim for relief alleges that Reclamation is liable under Section 9 of the ESA, 16 U.S.C. § 1538, because it has violated various incidental take limits for impacted listed species and otherwise abrogated the incidental take coverage of the BiOp and its ITS. (FAC, ¶¶ 139–143.)

## IV.    DISCUSSION

In evaluating the present motion, the Court is mindful of the limited scope of the issues before it. Plaintiffs have not challenged the BiOp or the ITS set forth therein, so the Court has not been asked to address whether the BiOp or ITS comply with the requirements of the ESA. Nor is it the Court's role to address whether Reclamation's planned operation of the CVP is the most advantageous operational plan for the listed species. *See Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1072–73 (9th Cir. 2024). Rather, Plaintiffs' relevant claim in this lawsuit is a narrow one: they allege Reclamation has not abided by the Shasta Framework by designating 2026 as a Bin 2 year and thus that Reclamation has breached the incidental take coverage provided by the BiOp. (FAC, ¶¶ 88–89, 123-25.)[10]

### A.    Nature of the Injunctive Relief Sought

Preliminary injunctions may be mandatory or prohibitory. *N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). A mandatory injunction is one that orders a party to "take action," while a prohibitory injunction is one that "restrains" a party from further action and "aims at simply maintaining the status quo." *N.D.*, 102 F.4th at 992; *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996). The Ninth Circuit observed that "courts should be extremely cautious about issuing a preliminary injunction" when the requested mandatory relief "goes well beyond maintaining the status quo." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) (citation omitted). "The status quo ante litem for preliminary injunction purposes refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180,

---

[10] Plaintiffs do not, in this context, appear to allege that Reclamation has or is likely to <u>exceed</u> the BiOp's take limits related to Shasta operations. Plaintiffs do allege that Reclamation exceeded the BiOp's take limits in other ways not relevant to the present motion. (*See* FAC, ¶¶ 78–87, 120–22, 127.)

1191 (9th Cir. 2024) (internal citation and quotations omitted).

Parties seeking a mandatory injunction must establish "the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (emphasis in original). "Due to this 'heightened standard' . . . a court must first determine the nature of the requested injunctive relief. *United Farm Workers v. United States Dep't of Lab.*, No. 1:25-CV-1614 KES EGC, 2026 WL 1345918, at *14 (E.D. Cal. May 14, 2026 (quoting *Master Tax LLC v. Ultimate Software Grp.*, 770 Fed. Appx. 386, 387 (9th Cir. 2019); *Stanley*, 13 F.3d at 1320).

Federal Defendants assert that Plaintiffs are requesting a mandatory injunction because Plaintiffs "want Reclamation to develop an entirely new TMP that would effectively align CVP operations with a Bin 1B Year instead of the currently designated Bin 2A Year." (Doc. 69 at 19; *see also* Doc. 68 at 2 (State Water Contractors arguing the requested injunction is "particularly concerning" because it "would necessarily modify Reclamation's operations in a manner not anticipated or analyzed in the 2024 BiOp and for which Reclamation did not plan this year").)

Plaintiffs take the position that their requested injunction is prohibitory because they are simply seeking to maintain the status quo. (Doc. 72 at 7.) In support of their status quo theory, Plaintiffs rely principally on *Flathead-Lolo*, 98 F.4th at 1191. (Doc. 72 at 8.) There, the plaintiffs alleged Montana regulations authorizing recreational wolf and coyote trapping allowed the unlawful taking of grizzly bears in violation of ESA § 9. *Id*. at 1184. Plaintiffs sought and were granted an injunction against all such trapping outside of certain months when it was reasonably certain all grizzly bears would be in their dens. *Id*. Defendants argued that the requested relief should have been categorized as a mandatory injunction because the status quo would have been a return to 2022 regulations that permitted trapping under slightly different circumstances. *Id*. at 1991. The Ninth Circuit disagreed:

> The injunction prevents the State from authorizing any wolf trapping and snaring in certain areas outside January 1, 2024 to February 15, 2024. That is a prohibitory injunction because it prevents the State from enforcing its regulations that authorize wolf trapping . . . .
>
> The injunction also maintains the status quo. The "status quo ante

litem" for preliminary injunction purposes "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)). Plaintiffs filed suit in September 2023. Thus, the last uncontested status preceding the lawsuit was no authorized recreational wolf trapping or snaring, as the 2022 wolf trapping season had ended on March 15, 2023, and wolf trapping was not scheduled to start again until November 27, 2023. *See 2022 Regulations, supra*, at 15; *2023 Regulations, supra*, at 15.

*Id*.

Plaintiffs argue here "[t]he last uncontested status quo was the presence of more than 3.7 MAF of water in Shasta Reservoir at the end of April [2026] and the associated requirements that flow from that fact (i.e., Bin 1 operational constraints)." (Doc. 72 at 7.) Put another way, according to Plaintiffs: "The operation of the dam pursuant to Bin 2A standards is the contested action." (*Id*.) Plaintiffs contend that Reclamation's use of both EOA and EOS predictions to set 2026 as a Bin 2 year is inconsistent with how Reclamation applied the Shasta Framework in 2025. (*See* Doc. 72 at 15.) Specifically, Plaintiffs assert that Reclamation initially designated 2025 as a Bin 1B year "based on end-of-April storage of greater than 3.7 MAF," (Doc. 72 at 15 (citing Doc. 72-1 at 5 et seq. (2025 Draft TMP))), and that Reclamation only "reclassified" 2025 as a Bin 2A year after later modeling indicated that Reclamation would be unable to meet the Bin 1B 2.4 MAF EOS storage target. (Doc. 72 at 15 n.5 (citing Doc. 47-2 at 165 (2025 Final TMP).) But Plaintiffs fail to acknowledge that at the time the 2025 Draft TMP issued, Reclamation predicted EOS storage of <u>over 2.4 MAF but less than 3.0 MAF</u>, triggering a Bin 1B year under either interpretation of the Bin framework. (*See* Doc. 72-1 at 9 ("Based on the April 90% CVP Operations Outlook (Attachment 2), Reclamation has identified Water Year 2025 as a Bin 1 year. In a Bin 1 year, Shasta Reservoir storage is forecast to be greater than 3.7 million acre-feet (MAF) at the beginning of May; greater than 2.4 MAF at the end of September; and meet 53.5°F downstream of CCR. However, Shasta storage is forecast to be less than 3.0 MAF at end of September and therefore would be categorized as a Bin 1B.").)[11]

---

[11] As discussed in greater detail below, Plaintiffs' interpretation focuses on the first sentence of this quotation, which suggests that the Bin is chosen solely based on EOA storage volumes, while Reclamation's interpretation focuses on other definitions of the Bin framework expressed, for example, in

17

Plaintiffs' approach to determining the status quo presumes their interpretation of the BiOp's terms is correct, notwithstanding the fact that the BiOp (with its disputed terms) was in effect during the period they contend operates as the status quo. That is not analogous to the situation at issue in *Flathead-Lolo*. There, the plaintiffs challenged a *new* approach to setting the start and end dates of trapping/snaring season in occupied grizzly habitat. *Id*. at 1185–86. Whereas earlier regulations (from 2021 and 2022) used identifiable landmarks to determine occupied grizzly habitat, the 2023 regulation used a different method that resulted in a smaller area being designated as occupied. *Id*. Because Plaintiffs sued *after* the previously authorized 2022 trapping season had ended and before the 2023 season had begun under the new regulations, the Ninth Circuit determined that the appropriate status quo was "no authorized recreational wolf trapping." *Id*. at 1191. In addition, *Flathead-Lolo* emphasized that the injunction issued in that case was prohibitory because it "prevents the State from enforcing its regulations that authorize wolf trapping." *Id*. This underscores that the mandatory/prohibitory distinction involves both an examination of the *nature* of the requested relief and a determination of the appropriate status quo, because the key question is whether the requested injunction "goes well beyond maintaining the status quo." *Stanley*, 13 F.3d at 1319 (9th Cir. 1994); s*ee also San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 596 (9th Cir. 2025) (characterizing as "mandatory" an injunction that required the defendant "to take certain actions, including, but not limited to, submitting and implementing a proposed plan for releasing sufficient flows from Lopez Dam into the lower AG Creek area"); C*oastkeeper v. Santa Maria Valley Water Conservation Dist*., No. CV 19-08696 ABJ PRX, 2020 WL 3247371, at *1 (C.D. Cal. Apr. 17, 2020)

Here, for the reasons already discussed, the Court finds that the status quo is not a hypothetical operation under the BiOp in accordance with Plaintiffs' interpretation of the BiOp's terms.[12] Thus, Plaintiffs' demand to model and then manage the Projects to conform to their interpretation of the BiOp is a request for a mandatory injunction that goes "well beyond" the

the second sentence of this quotation. This interpretive dispute is the crux of this motion.

[12] Nor would the status quo be, as other parties suggest, operation under Reclamation's interpretation. (*See* Doc. 68 at 2 (suggesting, erroneously, that the Court has already concluded that Reclamation's designation of 2026 as a Bin 2A year is consistent with the Proposed Action and thus that Plaintiffs request a mandatory injunction).)

18

status quo and is therefore subject to heightened scrutiny, rendering the alternative, sliding scale "serious questions" standard inapplicable. *See United Farm Workers*, 2026 WL 1345918 at *14 (classifying requested relief as a mandatory injunction where plaintiffs requested that the Defendants adopt a new methodology for calculating wage rates that "complies with applicable law").

### B.      Likelihood of Success

#### 1.        Applicable Legal Standards

Having identified that the motion involves a dispute over how to interpret the BiOp, the Court requested supplemental briefing on the applicable legal standard(s). (Doc. 61 at 17–18.) In response, Federal Defendants argue that the Court should look for guidance in *Kisor v. Wilke*, 588 U.S. 558 (2019), in which the Supreme Court discussed in detail the approach courts should take to applying *Auer*/*Seminole Rock* deference to an agency's interpretation of its own regulations. Notably, the Ninth Circuit recently applied *Kisor* to an interpretive dispute involving a forest management plan. *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 894 (9th Cir. 2025). As *Cascadia* summarized:

> In *Kisor*, the Supreme Court articulated the circumstances in which a court may defer to an administrative agency's interpretation of its regulation. Often, we do not need to resort to deference to interpret a regulation. "'If [a] regulation is unambiguous and "there is only one reasonable construction of [the] regulation," then we' simply apply that meaning." *United States v. Cal. Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1222 (9th Cir. 2024) (alterations in original) (quoting *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022)). "If the text seems to have more than one plausible meaning, then we must try to resolve the ambiguity by 'carefully consider[ing] the text, structure, history, and purpose of [the] regulation.'" *Id.* (alterations in original) (quoting *Kisor*, 588 U.S. at 575). "If, after 'exhaust[ing] all the "traditional tools" of construction,' we determine that 'the interpretive question still has no single right answer,' then we consider whether the agency's interpretation is reasonable, and, if so, whether it is entitled to deference ...." *Id.* (alteration in original) (quoting *Kisor*, 588 U.S. at 575–76).
>
> In sum, for us to defer to an agency's interpretation of its own regulation, three criteria must be met: "(1) the regulation is 'genuinely ambiguous,' (2) the interpretation is 'reasonable,' and (3) the interpretation is entitled to 'controlling weight.'" *United States v. Yafa*, 136 F.4th 1194, 1197 (9th Cir. 2025) (quoting *Kisor*, 588 U.S. at 574–79).

153 F.4th at 894.

*Cascadia* found that *Kisor* provided the appropriate framework for evaluating an agency's construction of a land use/resource management plan under the Federal Land Policy and Management Act (FLPMA). *See id.* Specifically at issue in *Cascadia* was a resource management plan (RMP) governing land use in western Oregon. 153 F.4th at 883. That plan included "Management Directions" designed to identify which future actions might be permitted on the covered lands, and what restrictions or requirements must be placed on those future actions to achieve objectives set by the RMP. *Id.* The agency promulgated a Management Direction related to a particular bird species, *id.* at 884, and later exchanged interpretive memoranda on the subject with FWS. *Id.* at 886. The plaintiffs advanced an interpretation of the Management Directive that differed from that set forth in the agency's interpretive document; plaintiffs' interpretation, if correct, would have rendered an agency-approved logging project non-compliant with the relevant RMP. *See id.* at 893–96.

Though Federal Defendants correctly point out that *Kisor* itself concerned an agency's interpretation of a regulation, while this case concerns Reclamation's interpretation of a BiOp (Doc. 69 at 22–23, n. 7), *Cascadia*'s application of *Kisor* to a Management Direction issued under an RMP is a somewhat closer fit to the situation presented here. *See Cascadia*, 153 F.4th at 893 ("We agree that *Kisor* provides the applicable framework for when we can defer to an agency's construction of a land use plan such as a resource management plan, so we analyze the RMP under its strictures.").

Plaintiffs disagree that *Kisor*'s framework of deference applies for a variety of reasons. (*See* Doc. 72 at 6 n. 1.) First, Plaintiffs argue that the BiOp was not prepared or issued by Reclamation and its interpretation does not trigger Reclamation's expertise, which is in operations, not species protection. (*Id.*) In addition, Plaintiffs insist that the ESA directs Courts to resolve uncertainties of this nature in favor of the species. (*See* Doc. 72 at 6 citing *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1166-67 (9th Cir. 2009); *Flathead-Lolo-Bitterroot Citizen Task Force v. State*, 703 F. Supp. 3d 1229, 1240 (D. Mt. Nov. 21, 2023) ("When, as here,

reasonable legal positions on either side conflict, the ESA requires that protected species be given the benefit of the doubt in management decisions.") (internal quotations omitted); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 873 (D. Or. May 4, 2016) ("To accept NOAA Fisheries' statements at face value at this point contradicts the requirement of the [ESA] that the [] agency must give the benefit of the doubt to the endangered species.") (internal quotations omitted); *WildEarth Guardians v. United States Fish & Wildlife Serv.*, 782 F. Supp. 3d 893, 913 (C.D. Cal. May 12, 2025) (holding that the "weight of binding [9th Circuit] decisions state that, if courts do not give the species the benefit of the doubt, they are ignoring Congress's intent in passing the ESA").).

On a practical level, most of the cases cited by Plaintiffs do not involve interpretive disputes. *See Flathead-Lolo*, 03 F. Supp. 3d at 1240 (addressing impacts on grizzly bear of wolf/coyote trapping regulations); *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 873 (addressing, among other things, whether NOAA Fisheries appropriately assumed specific numerical benefits from habitat improvement notwithstanding confidence intervals so large as to render them meaningless); *Wildearth Guardians*, 782 F. Supp. 3d at 913 (discussing whether agency properly evaluated impacts of climate change before declining to list plant species under the ESA; rejecting argument that the court should not "distort" scientific judgment by "indulging in worst case scenarios" and instead finding species should be given the benefit of the doubt under the ESA).

The sole exception is *Arizona Cattle Growers*, which addressed whether FWS permissibly interpreted the word "occupied" in the ESA's definition of "critical habitat" to include areas where the species in question was likely to be present. 606 F.3d at 1163 (discussing 16 U.S.C. § 1532(5)(A)). This stood in contrast to the narrow interpretation advanced by the plaintiffs, who argued "occupied" meant only areas in which the species actually resides. *Id*. at 1164. The Ninth Circuit concluded FWS advanced a "permissible" interpretation of the term "occupied" for several reasons, including because the agency's interpretation was consistent with the purposes of the ESA. *Id*. at 1166–67 ("Where data are inconclusive or where habitat is used on a sporadic basis, allowing the FWS to designate as 'occupied' habitat where the species is likely to be found

21

promotes the ESA's conservation goals and comports with the ESA's policy of 'institutionalized caution.'").[13] [14]

Arizona Cattle Growers underscores a familiar interpretive presumption, because it is well established that the ESA embodies Congressional intent that agencies "give the highest of priorities and the benefit of the doubt to preserving endangered species." See Ariz. Cattle Growers, 606 F.3d at 1167 (citing Sierra Club v. Marsh, 816 F.2d 1376, 1386 (9th Cir. 1987).) However, the Court is not being asked to interpret statutory terms here; rather, the dispute is over how to interpret a process described in the Proposed Action and later evaluated in the BiOp, a document which remains valid and unchallenged. Cascadia suggests that the immediate "purpose" that is relevant in such an interpretive exercise is the "purpose" of the BiOp. Cascadia, 153 F.4th at 895 ("After considering the "text, structure, history, and purpose," id., of the RMP— all of the tools in our interpretive toolbox—we conclude that the Murrelet Management Direction is susceptible to more than one reasonable reading."). Moreover, to the extent the ESA's interpretive presumption in favor of the species remains relevant, it is a tool for choosing between competing plausible interpretations of a text. Cf. Stevens v. Optimum Health Inst.--San Diego, 810 F. Supp. 2d 1074, 1099 (S.D. Cal. 2011) (explaining that the doctrine of constitutional avoidance is "a tool for choosing between competing plausible interpretations of a statutory

---

[13] The Skidmore/Mead deference given the agency's interpretation of the statutory command in Arizona Cattle Growers might not be appropriate post-Loper. See Lopez v. Garland, 116 F.4th 1032, 1036 (9th Cir. 2024) (although an agency's interpretation is "'not controlling,' it may still have 'power to persuade' based on 'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements'"). Regardless, Plaintiffs are relying on Arizona Cattle Growers for the opposite proposition, namely that the court should not defer to an agency's interpretation when doing so would conflict with the purpose of the document being interpreted.

[14] In a sur-reply, Plaintiffs also discuss two additional cases that applied Kisor in somewhat analogous circumstances. (See Doc. 72 at 7.) In Sovereign Iñupiat for a Living Arctic v. BLM, the district court evaluated a biological opinion in which FWS had developed a particular interpretation/application of its own harassment regulation and found that the interpretation was inconsistent with the plain, unambiguous text of the regulation. 701 F. Supp. 3d 862, 911 (D. Ak. Nov. 9, 2023), aff'd in part, rev'd in part and remanded sub nom. on other grounds Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 141 F.4th 976 (9th Cir. 2025). In Center for Biological Diversity v. U.S. Forest Service, the district court declined to defer to FWS guidance about its obligation to reinitiate consultation, finding the guidance conflicted with an unambiguous regulation related to reinitiation. 522 F. Supp. 3d 611, 617 (D. Az. Feb. 22, 2021). These cases serve to reiterate Kisor's command that when a text is unambiguous, a court should not defer to a conflicting agency interpretation.

text").

For purposes of this preliminary review of the merits, the Court will use *Kisor* as a framework to aid its analysis of the interpretive dispute. Ultimately, because it finds that Reclamation's interpretation is more robustly supported by the relevant texts, the Court does not proceed to *Kisor*'s later steps.

### 2. Interpretive Dispute

Under *Kisor*, the first step is to determine whether the Shasta Framework is "genuinely ambiguous." *Kisor*, 588 U.S. at 574. "Before concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Cascadia*, 153 F.4th at 894–95 (internal citations and quotations omitted). As mentioned, if the relevant text is "unambiguous and there is only one reasonable construction," then the court "simply appl[ies] that meaning." *Id*. at 984. "If the text seems to have more than one plausible meaning, then [the court] must try to resolve the ambiguity by 'carefully consider[ing] the text, structure, history, and purpose of [the] regulation.'" *Id*.

### a. *Text of the BiOp*

For reasons already articulated in the Court's July 9 TRO Order (Doc. 61), the Court concludes that the text of the BiOp, viewed in isolation, has more than one plausible meaning. Plaintiffs point to the following rows of Table 25 from the BiOp, which the Court duplicates here with the relevant headings for ease of reference:

| | Bin 1A | Bin 1B | Bin 2A | Bin 2B | Bin 3A | Bin 3B |
|---|---|---|---|---|---|---|
| **EOA (MAF)** | $\geq 3.7$ | | 3.0-3.7 | | <3.0 | |
| **EOS (MAF)** | $\geq 3.0$ | $\geq 2.4$ | 2.2-2.4 | 2.0-2.2 | >2.0 | <2.0 |
| **Hydrologic Goal** | | Initiate drought protection | | Increase drought protection | | Increase drought protection |

| Operational Goals | | Increase EOS ≥ 2.4 MAF. If impossible, shift into Bin 2A. | Increase EOS >2.2 MAF. If impossible, shift into Bin 2B. | Increase EOS >2.0 MAF. If impossible, shift into Bin 3A. | Increase EOS >2.2 MAF. If impossible shift to Bin 3B. | Increase EOS >2.0 MAF. If impossible identify system priorities and contingencies. |
|---|---|---|---|---|---|---|

(BiOp at 286). Plaintiffs argue that per this Table, when there is 3.7 MAF of water in Shasta at the end of April it is *by definition* a Bin 1 year. (Doc. 47-1 at 13; 6/24/26 Rosenfield Decl., ¶ 59; Doc. 72 at 9 (calling Table 25 the "best evidence" of NMFS's understanding of the Proposed Action and the Shasta Framework).) Indeed, the row labeled "EOA (MAF)" categorizes any year with EOA storage of 3.7 or more as a Bin 1 year because it appears to *cap* Bin 2 years at 3.7 MAF by indicating EOA for Bin 2 years must fall within the 3.0 – 3.7 MAF range. Using this row's categorization scheme as a foundation, Plaintiffs argue that this year cannot be a Bin 2 year unless the requirements of the final line of the table excerpt are satisfied, allowing a shift from Bin 1 into Bin 2A only if maintaining EOS at or above 2.4 is "impossible." (Rosenfield Decl. ¶ 63.) Put another way, in a year like this one where EOA storage exceeds 3.7 MAF, Plaintiffs read the last line of this table to mean that Reclamation must examine whether it is possible to increase EOS storage to at least 2.4 MAF before declaring a Bin 2A year.[15]

Plaintiffs also point to the underlined language below from another section of the effects analysis, the BiOp states:

> **Water Temperature and Storage, Egg Incubation, and Emergence Temperature Objectives**
>
> Shasta Reservoir is the largest reservoir in the CVP and the state of California and is operated to best meet all the authorized purposes of the reservoir to maximize the beneficial use of inflow and provide flood protection for the Sacramento River. However, climate change is making this task more difficult. Droughts are becoming more frequent and severe, with less rain and snowmelt refilling the reservoir. Due to climate change, Shasta Reservoir's watershed is anticipated to have significantly less inflow, higher evaporation and evapotranspiration due to increased temperature

---

[15] According to Plaintiffs, Reclamation failed to demonstrate that it is impossible to increase EOS to 2.4 MAF this year and, thus, it is unlawful for Reclamation to designate 2026 as a Bin 2A year. (*See* Rosenfeld Decl., ¶ 63.) Reclamation does not directly dispute this—at least not on the present record. In fact, the record contains modeling from the Southwest Fisheries Science Center, a branch of NMFS, that appears to suggest retaining an additional 200,000 AF of water in Shasta is at least theoretically possible. (*See* Rosenfeld Decl., ¶ 72.)

24

and more extreme hydrological and meteorological events. These factors combine to exacerbate threats to the Sacramento River's endangered anadromous fish species, which are already stressed by multiple challenges.

In response, Reclamation is proposing an approach that considers drought protection actions nearly every year and identifies actions that will protect storage for multiple project purposes, including temperature management. This approach acknowledges the near-constant threat of drought and that drought protection and fish protection go hand-in-hand. The approach borrows from strategies developed in Victoria, Australia, during a recent multi-year drought (Mount et al. 2016, "Victorian Objectives"). It outlines different management approaches based on water availability to achieve explicit biological objectives. During wetter water years, the focus is on enhancing fish habitats. In drier years, the goal becomes recovering and maintaining these habitats, and in severe droughts, simply protecting habitats becomes the priority. The approach is documented in a Shasta Reservoir Management Plan (Shasta Management Plan) that will use a system of management "Bins" to develop a TMP to administer water temperature and storage levels (Figure 54). There are three Bins (1, 2, and 3) based on the expected EOA storage. Each Bin has two categories: A (standard) and B (drought protection). As the proposed action describes (U.S. Bureau of Reclamation 2023-2024), the letter of the Bin (A or B) is primarily driven by the expected demands on the reservoir which are a function of hydrology, meteorology, system-wide conditions, contractual requirements and other conditions.

(BiOp at 283–84 (emphasis reflecting passage quoted by Plaintiffs at Doc. 72 at 9–10).)

The emphasized passage above generally supports Plaintiffs' position that the BiOp assumed the Bin categorization (1, 2, or 3) is driven by EOA storage and that when EOA exceeds 3.7 MAF a Bin 1 year should result. However, the sentence immediately preceding the underlined text clearly indicates that the Framework Approach is depicted in Figure 54, which is the Decision Tree taken directly from the Proposed Action and reproduced in the BiOp. The Decision appears to capture Reclamation's interpretation of the Shasta Framework in a straightforward way.

25



(Doc. 47-2 at 181.) Reclamations' conduct is consistent with a plain reading and application of the Decision Tree. Reclamation's April 90% exceedance forecast, dated April 21, 2026, indicated that EOA storage would be 4.2 MAF and *estimated* as of the date of that forecast that EOS storage would be 2.205 MAF. (Doc. 50-10 at 27.) Applying those volumes to the Decision Tree starting in the upper right corner, causes the answer to be "Yes" at the first branch, followed by "No" at the second branch, and again "No" at the third branch, which leads to the result that the water year is Bin 2A.[16]

---

[16] Plaintiffs make an argument in reply about the Decision Tree that is difficult to understand:

> [T]he flowchart preceding Table 25 (Figure 54) illustrates and confirms Plaintiffs' interpretation. At the start, the red text in the top left corner provides two thresholds for end-of-April storage, one at 3.7 MAF and another at 3.0 MAF, resulting in three potential classifications: greater than 3.7 MAF, between 3.0 and 3.7 MAF, and below 3.0 MAF. *Id.* at 65 (biological opinion at 285). The question of whether end-of-April storage is greater or less than 3.0 MAF only comes into play if the answer to whether end-of-April storage is greater than 3.7 MAF is "no." *Id.* Further, the arrows labelled "no" leading from the lowest allowable end-of-September storage for a B-type Bin year to an A-type of the next lower number reflect Reclamation's ability to reclassify a Bin 1B year to a Bin 2A year or a Bin 2B year to a Bin 3A year when it is impossible to achieve that lowest allowable end-of-September storage amount for a Bin 1B or 2B year, respectively. *Id.* Reclamation reads the flow chart backward, starting with end-of-September storage and working backward to the end-of-April storage amounts and associated Bin number designation.

(Doc. 72 at 10-11.) At best, the latter part of this argument about reclassification reads something into the Decision Tree that is not facially apparent.

Looping back to *Kisor*, the text of the BiOp contains conflicting information/reflections of the Shasta Framework and thus the text BiOp itself has more than one plausible reading.

b.      *Structure/Purpose*

The Court thus turns to other issues which implicate the structure and purpose of the BiOp. As Federal Defendants point out: "The purpose of the BiOp was not to describe the Proposed Action or prescribe the Bin Year framework; it was to analyze effects to species from the Proposed Action. The BiOp summarizes the Proposed Action to memorialize the information on which NMFS's opinion about its effects is based." (Doc. 75 at 2–3); *see also Haaland*, 102 F.4th at 1072–73 ("The consulting agency must analyze the project as presented.") (internal quotation and citation omitted). Nothing in the BiOp suggests NMFS intended to modify the Shasta Framework as it is described in the Proposed Action. For example, Table 25 describes itself as being "summarized from (U.S. Bureau of Reclamation 2023-2024)," (BiOp at 285), which is a reference to Reclamation's description of the Shasta Framework in its Proposed Action. The ITS expressly relies on the Shasta Framework "as defined in the proposed action." (*Id*. at 889.) Thus, the text of the Proposed Action is relevant to this interpretive dispute. *Cf. Mont v. United States*, 587 U.S. 514, 524 (2019) (explaining that the "whole-text canon requires consideration of the entire text, in view of its structure and the logical relation of its parts." (cleaned up)).

The Proposed Action generally defines the Bins as follows:

- Bin 1A is defined as having an end of April storage at or above 3.7 MAF and a projected end of September storage of at least 3.0 MAF.
- Bin 1B is defined as having an end of April storage at or above 3.7 MAF and a projected end of September storage of at least 2.4 MAF.
- Bin 2A is defined as having an end of April storage ***at or above 3.0 MAF*** and a projected end of September storage of at least 2.2 MAF.
- Bin 2B is defined as having an end of April storage at or above 3.0 MAF and a projected end of September storage of at least 2.0 MAF.
- Bin 3A is defined as having an end of April storage below 3.0 MAF and a

27

projected end of September storage greater than 2.0 MAF.

- Bin 3B is defined as having an end of April storage below 3.0 MAF and a projected end of September storage less than 2.0 MAF.

(Proposed Action, 3-16–3-21 (emphasis added).) Notably, as emphasized, the Proposed Action does not cap Bin 2A years at 3.7 MAF and thus does not articulate an intent to force every year in which EOA storage is above 3.7 MAF into Bin 1. Rather, the Proposed Action appears to allow what Reclamation has done here: make an initial designation of Bin 2A where EOA storage is above 3.7 MAF but projected EOS storage is below 2.4 MAF. All this suggests that Table 25 incorrectly summarizes the EOA ranges articulated by the Proposed Action.

As the Court discussed in the July 9, 2026 TRO Order (Doc. 61 at 16–17), additional language in the Proposed Action's description of Bin 1B arguably muddies the waters:

> Bin 1B is typically a result of a good water year but the system may be slightly stressed, or the water supply may be less than what is seen under Bin 1A. Bin 1B is defined as having an end of April storage at or above 3.7 MAF and a projected end of September storage of at least 2.4 MAF. Consistent with Bin 1A years, this EOA storage ensures good temperature management through providing access to using the upper gates of the TCD. The EOS storage of 2.4 MAF provides a high likelihood of EOA storage greater than 2.8 MAF the following year which is a point at which biological impacts from higher temperatures start to increase significantly. An EOS storage of 2.4 MAF along with the higher fall/winter minimum flows also lessens the potential for fall/early winter flood control releases, although these releases are still expected to occur under wetter hydrology. Similar to Bin 1A, Reclamation, through coordination with SRG and the SHOT, will analyze tradeoffs of establishing downstream temperature locations that support the biological goal of maximizing suitable habitat and the risk of running out of cold water. Reclamation will consider light system tradeoffs for supporting higher Shasta storage (up to 3.0 MAF) with minimal impacts to other parts of the system during their monthly forecasting process. If there are tradeoffs with higher impacts that should be considered to meet the Bin 1 Shasta EOS storage range, Reclamation will consider these through coordination with the SHOT. Available actions primarily include rebalancing between other CVP reservoirs while maintaining all operational goals. If available actions result in storage of 2.4-3.0 MAF, then no further actions would be pursued. *If available actions are not sufficient to result in a storage of at least 2.4 MAF, then this year would be reclassified as Bin 2A*.

(Proposed Action at 3-16–3-17 (emphasis added).) Approximately one page later, in a sub-section entitled "Bin 1 Operational Goals and Indicators," the Proposed Action also states: "The goal of

28

actions is to increase projected EOS storage above 2.4 MAF. If this is not possible, shift to Bin 2A." Dr. Rosenfield appears to reference this line (6/24/26 Rosenfield Decl., ¶ 63), presumably as further support for Plaintiffs' theory that Reclamation must take any available steps to adjust its EOS projections to reach 2.4 MAF before giving up on Bin 1. Indeed, the use of the word "projected" in that sentence somewhat supports such an interpretation. But when this line is read in the context of the entire Bin 1B description, including the paragraph quoted above, the meaning becomes less clear. First, as mentioned, the Bin 1B description defines Bin 1B "as having an end of April storage at or above 3.7 MAF and a *projected* end of September storage of at least 2.4 MAF." The text then discusses the use of actions to "result" in EOS storage of at least 2.4 MAF. Should available actions prove insufficient to accomplish this, then the water year would need to be "re-classified" (as opposed to initially classified) as Bin 2A, triggering, among other things, possible reductions in water supply. (*See* Proposed Action at 3-18.) All this at least plausibly suggests that the BiOp, by relying on the Proposed Action, anticipated the very stepped process Reclamation has implemented here, namely that Reclamation would use the April 90% forecast to set the Bin, the EOS "operational goals" of which Reclamation must abide by unless "available actions" (which become more aggressive as the Bin number increases) are insufficient to ensure that the "result" of Project operations is actual EOS storage at or above the goal.

To the extent the above demonstrates ambiguity within the Proposed Action itself, other information points toward Reclamation's interpretation. To reiterate, Plaintiffs' position is that EOA storage values should be used to force Reclamation to meet Bin 1 EOS targets even when Reclamation's early-season projections do not produce EOS estimates in the Bin 1 range. (*See* Doc. 72-2, ¶ 28 ("There is no indication that these agencies projected Shasta Framework bin number frequencies based on EOS storage; such a system would be circular and inconsistent with the Shasta Framework since the Framework was designed to determine appropriate CVP operations, not the other way around.").) According to Plaintiffs "one reason Reclamation is obligated to operate the dam and reservoir to store more water during Bin 1 years is to increase the likelihood that there will be sufficient water to manage the dam and reservoir the following

year." (Doc. 72 at 13.)[17] It is Plaintiffs' position that Reclamation's interpretation allows the agency to "manipulate its downstream releases to dictate end-of-September storage projections in ways that then determine the Bin year designations and associated regulatory safeguards applicable for winter-run Chinook Salmon." (*Id.*) Put slightly differently, Plaintiffs contend that under Reclamation's interpretation the Shasta Framework "becomes circular" because "how much end-of-September storage Reclamation is required to target is a function of how much end-of-September storage Reclamation projects." (Doc. 72 at 11.) Plaintiffs argue that "the better understanding" is that "in years when end-of-April storage is sufficient (i.e., greater than 3.7 MAF), Reclamation must target higher end-of-September storage unless it is impossible to do so." (*Id.*)

Reclamation, in contrast, contends that the Framework deliberately "baked in" EOS storage to give Reclamation the flexibility it needs to manage the CVP in more challenging water years. (Doc. 81 at 6.) Federal Defendants explain:

> Reclamation put forward a Proposed Action that allows it to meet its myriad legal obligations in light of ever-changing on-the-ground conditions. Plaintiffs' proposed interpretation that EOA storage above 3.7 MAF requires Reclamation to operate to certain projected EOS storage cannot be what Reclamation intended when it authored the Proposed Action because it places Reclamation in an impossible situation. Projected EOS storage takes into account Reclamation's ability to meet its other legal obligations while maximizing how much water is carried over in the Shasta Reservoir for the benefit of winter-run Chinook salmon the following year. When making EOS

---

[17] Relatedly, Plaintiffs argue that Reclamation's interpretation undermines the drought-planning purpose of the Shasta Framework. (Doc. 72 at 13–14 (citing BiOp at 283–87).) There is no question that drought planning is a purpose of the Shasta Framework. (*See* BiOp at 283–84). But the BiOp also acknowledges that "Shasta Reservoir is the largest reservoir in the CVP and the state of California and is operated to best meet all the authorized purposes of the reservoir to maximize the beneficial use of inflow and provide flood protection for the Sacramento River" and describes the Shasta Framework as "an approach that considers drought protection actions nearly every year and identifies actions that will protect storage for multiple project purposes, including temperature management." (*Id.*) Thus, drought protection is not the sole purpose of the Shasta Framework. (BiOp at 283–84 (emphasis reflecting passage quoted by Plaintiffs at Doc. 72 at 9–10)); *see also Cascadia*, 153 F.4th at 896–97 ("To be sure, the provision—and a good portion of the RMP in general—was designed to help protect habitat for the marbled murrelet and contribute to the recovery and growth of that species. But a land use plan, such as the RMP, is an exercise in balancing various goals. Those goals include ecological and environmental goals, such as helping to ensure the recovery of the marbled murrelet, as well as commercial and productivity goals—including the requirement to consistently produce timber that would meet the demands of the O&C Act. We thus do not see purpose as dissolving the ambiguity that hangs over the Murrelet Management Direction and the term 'modifying nesting habitat' specifically.").

storage projections, Reclamation considers how much water it would need to release to fulfill the approximately 170 water contracts that it has. *See* Dkt. 50-2 at 13; Ex. D (Final Environmental Impact Statement, Appendix C) at C-47-48. Many of those contracts only allow for reductions if failing to do so would cause Reclamation to violate other legal obligations. *See* Ex. D at C-47 (discussing that for water service and repayment contracts, "each of these con-tracts shields Reclamation from any liability if there is a shortage of CVP Water due to a drought or actions taken by Reclamation to meet a relevant legal obligation."). In line with these contractual provisions, the Proposed Action allows Reclamation to reduce allocations for these contracts in Bin 2 or 3 years to allow it to meet its ESA obligations. Dkt. No. 50-2 at 28-33. But Reclamation does not have the discretion to reduce contractual allocations in Bin 1 years under the Proposed Action. *Id.* at 25-27. If Reclamation were to operate this year under Plaintiffs' interpretation of the Proposed Action (*e.g.*, operating to a Bin 1 year) that would actually prevent Reclamation from making the reductions it would need to target EOS storage of 2.4 MAF.

(Doc. 81 at 5-6 (emphasis added).)

The Court finds that this dispute is settled (at least preliminarily for purposes of this motion) by other information in the record. Specifically, the modeling Reclamation used to develop the Shasta Framework indicates that Reclamation indeed intended for the initial Bins determinations to be made with a combination of EOA and EOS projections

### *Shasta Lake End-of-September Minimum Storage*

Shasta is operated using the Water Temperature and Storage Framework approach which establishes management "Bins".

The Bin is determined February through May based on estimated Shasta fill and carryover, forecasted inflow, projected delivery, and projected regulatory cost. The May Bin estimate endures through September.

Bin 1A – End of April (EOA) estimate > 3.7 MAF and End of September (EOS) estimate > 3.0 MAF. Under Bin 1A normal operations occur.

Bin 1B – EOA estimate > 3.7 MAF and EOS estimate > 2.4 MAF. Under Bin 1B, a factor is applied to the reservoir balancing goals to prioritize Shasta storage if possible.

Bin 2A – EOA estimate > 3.0 MAF and EOS estimate > 2.2 MAF. Under Bin 2A, a factor is applied to the reservoir balancing goals to prioritize Shasta storage if possible, and additional cuts to CVP Service Contract allocations are based on the estimated and target carryover.

Bin 2B – EOA estimate > 3.0 MAF and EOS estimate > 2.0 MAF.

> Under Bin 2B, additional cuts to CVP Service Contract allocations are based on the estimated and target carryover.
>
> Bin 3A – EOA estimate > 3.0 MAF and EOS estimate < 2.0 MAF, or EOA estimate < 3.0 MAF and EOS estimate > 2.0 MAF, or EOA estimate < 3.0 MAF and EOS estimate < 2.0 MAF and October through April Shasta inflow > 2.5 MAF. Under Bin 3A, additional cuts are made to CVP Agriculture allocation and CVP Municipal and Industrial allocation can be cut down to Public Health and Safety (25% allocation) based on the estimated and target carryover.
>
> Bin 3B – EOA estimate > 3.0 MAF and EOS estimate < 2.0 MAF and October through April Shasta Inflow < 2.5 MAF. Under Bin 3B, CVP Agriculture Service allocation is 0% and CVP Municipal and Industrial Service allocation is 25%. Sacramento River Settlement Contractor (SRSC) allocation is reduced by up to 500 TAF (modeled by allocations as low as 47%). CVP North of Delta Refuge is given the same allocation as SRSC. Up to 280 TAF of reduced delivery to SRSC and Refuge demands is tracked in a storage account in Shasta. Reductions in storage withdrawal are tracked and used to adjust the COA balance.

(Doc. 81-2 at 38–39 (emphasis added).)[18] Bin 1B is triggered only if EOA exceeds 3.7 MAF and the EOS "estimate" exceeds 2.4 MAF. Bin 2A is triggered when EOA exceeds 3.0 MAF and the EOS estimate exceeds 2.2 MAF. Then, in Bin 2A years, cuts to CVP water service contracts may be based upon "the estimated and target carryover" which appears to be a reference to the need to meet or exceed the carryover target of 2.2 MAF for that Bin.

Reclamation's modeling also undermines another of Plaintiffs' arguments. As mentioned above, the BiOp indicates that Bin 1 years would occur in approximately 80% of years, while Bin 2 years are indicated to occur approximately 11.5% of the time. (BiOp at 285; Proposed Action 3-15, 3-18.) Dr. Rosenfeld opined based upon his evaluation of data from the last 30 years, that "the Bin 1 EOA storage criterion has been met in 77% (23 of 30)" of the last 30 years. (7/22/26 Declaration of Jonathan Rosenfield., Doc. 72-2, ¶ 27.) He further opines that "for Bin 1 years to occur in roughly 80% of years, as indicated by both the 2024 NMFS Biological Opinion and Reclamation's description of its proposed action, each of these historical years with EOA storage greater than or equal to 3.7 MAF would need to be operated to Bin 1 EOS storage requirements."

---

[18] The BiOp directly references and relies upon this modeling in numerous places. (*See, e.g.*, BiOp at 284 (relying on modeling from the Proposed Action); 285 (reproducing Figure 54, taken directly from the modeling Appendix of the Proposed Action).)

(*Id*.) In other words, "[a]llowing years with Bin 1 EOA storage to be become Bin 2 years would lead to Bin 1 years being less frequent than Reclamation and NMFS claim." (*Id*.) Furthermore, "[o]f those years that met the Bin 1 EOA storage criterion historically, five failed to meet the Shasta Framework's Bin 1 EOS storage criterion (Table 1b, infra.). This represents 17% of the last 30 years, far more frequent than Reclamation and NMFS anticipated for all Bin 2 years, and does not account for years with EOA storage that actually meet Bin 2 criteria." (*Id*., ¶ 28.) He concludes by stating that: "Unless the Shasta Framework compelled Reclamation to manage reservoir storage such that these years had at least 2.4 MAF of storage at the end of September, modeling would not have shown that approximately 80% of years would be Bin 1 years or that roughly 11.5% of years would be Bin 2 years under the Biological Opinion's Shasta Framework." (Id.)

Though this is a compelling narrative, Dr. Rosenfield's estimates consider a narrower dataset than Reclamation used to generate the approximations that ended up in the BiOP. (Doc. 81 at 3.) The BiOp's estimate that approximately 80% of years would fall into Bin 1 was generated by the CalSim II model, which uses an 82-year simulation period (Doc. 81-1 at 82), instead of the 30-year time horizon employed by Dr. Rosenfield. Moreover, as the modeling instructions indicate, in developing its Bin frequency approximations, Reclamation did not instruct its model to "manage reservoir storage" such that all years with Bin 1 EOA storage also have at least 2.4 MAF at the end of September.

The Court is left wondering what happens if these approximations turn out to be materially inaccurate. A similar concern was raised by commentators. (*See* Doc. 81-1 at 82.) But, again, the validity of the ITS is not challenged here. Ultimately, for the reasons set forth above, Plaintiffs do not appear likely to succeed on the claim they advance in the present motion and certainly not with the level of certainty required to obtain a mandatory injunction.

///

///

///

///

33

## V.    CONCLUSION AND ORDER

For the reasons set forth above, the request for a preliminary injunction (Doc. 47) is DENIED.

IT IS SO ORDERED.

Dated:   August 2, 2026

UNITED STATES DISTRICT JUDGE

34